UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

CODY STEVER,

                             Plaintiff,
                                                            5:20-CV-1467
v.                                                          (GTS/ATB)

CSX TRANSPORTATION, INC.,

                             Defendant.

_____

APPEARANCES:                                  OF COUNSEL:

CASEY JONES LAW FIRM                          NICHOLAS D. THOMPSON, ESQ.
    Counsel for Plaintiff
525 Junction Road, Suite 6500
Madison, WI 53717

BAILEY, JOHNSON & PECK, P.C.                   JOHN W. BAILEY, ESQ.
    Co-counsel for Plaintiff                   WILLIAM C. FIRTH, ESQ.
5 Pine West Plaza, Suite 507
Washington Avenue Extension
Albany, NY 12205

NIXON PEABODY LLP                              SUSAN C. RONEY, ESQ.
    Counsel for Defendant                      MARK A. MOLLOY, ESQ.
40 Fountain Plaza, Suite 500
Buffalo, NY 14202-2224

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

Currently before the Court, in this employment retaliation action, filed

by Cody Stever ("Plaintiff") against CSX Transportation, Inc. ("Defendant" or "CSXT")

pursuant to the whistleblower provision of the Federal Railroad Safety Act ("FRSA"), 49 U.S.C.

§ 20109, are the following two motions: (1) Defendant's motion for summary judgment pursuant

to Fed. R. Civ. P. 56; and (2) in the alternative, Defendant's motion to exclude the proposed

testimony of Plaintiff's expert witness George Gavalla both at trial and in opposition to

Defendant's motion for summary judgment.   (Dkt. Nos. 35, 36.)   For the reasons set forth

below, Defendant's motion for summary judgment is denied, and its motion to exclude the

testimony of Plaintiff's expert is granted in part and denied in part.

## I.      RELEVANT BACKGROUND

### A.      Plaintiff's Complaint

Generally, in his Complaint, Plaintiff asserts two claims.   (Dkt. No. 1.)   First, Plaintiff

claims that Defendant negligently failed to provide him with a reasonably safe working

environment in violation of the Federal Employer's Liability Act ("FELA") as a result of which

he suffered an injury to his left shoulder on August 2, 2018 ("First Claim").[1]   (*Id.* at ¶¶ 19-25.)

Second, Plaintiff claims that Defendant violated the FRSA by terminating him after he

engaged in protected activity, namely reporting the injury he suffered on the job on August 2,

2018, and using accusations that he violated various safety rules as a pretext for that unlawful

termination ("Second Claim").   (*Id.* at ¶¶ 26-30.)

### B.      Undisputed Material Facts on Defendant's Motion for Summary Judgment

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a

response to the moving party's Statement of Material Facts that "shall mirror the movant's

Statement of Material Facts by admitting and/or denying each of the movant's assertions in a

---

[1]      In its memorandum of law, Defendant asserts that, since the filing of the Complaint, the First Claim has been resolved through Plaintiff's signing of a Release and Waiver that has withdrawn that claim.   (Dkt. No. 35, Attach. 36, at 10 n. 6.)   Plaintiff does not appear to challenge this statement in his opposition memorandum of law.   (Dkt. No. 37.)   However, there does not appear to be evidence submitted of any such agreement (and Defendant does not cite any evidence in support of its assertion that the agreement exists), nor does the docket reflect any notice or request to the Court to withdraw the claim from this action.   (*See generally* Dkt. Report.)   The parties are therefore directed to promptly file a notice or request to withdraw the First Claim if that is indeed what both parties have agreed to do.

2

short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 56.1(b). This requirement is not a mere formality; rather "this and other local rules governing summary judgment are essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties." *LaFever v. Clarke*, 17-CV-1206, 2021 WL 921688, at *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]). Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.'" *LaFever*, 2021 WL 921688, at *7 (quoting *Alke v. Adams*, 16-CV-0845, 2018 WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]). "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 56.1(b).

Applying this legal standard here, the following facts have been asserted and supported by record citations by Defendant, and either expressly admitted or denied without a supporting record citation by Plaintiff.

1.      Plaintiff Cody Stever was employed with Defendant CSXT as a conductor from April 2015 until his dismissal in April 2019.

2.      As a conductor, Plaintiff's duties and responsibilities included building trains by "switching" or moving and arranging railcars according to their respective destinations, working in the railyard or on road trains, and generally working to ensure safe railroad operations.

3.      Plaintiff worked in the Albany Division and his primary territory included the

3

CSXT mainline from the DeWitt railyard in East Syracuse to Selkirk, New York.

4.      As an employee in Defendant's Transportation Department, Plaintiff was responsible for knowing and following the railroad's safety rules and operating rules, a fact Plaintiff admitted during his deposition.[2]

5.      Defendant's Operating Rules are included in its Employee Operating Manual, and all employees are required to know and comply with such rules.   Defendant's Operating Rules include, among other categories, safety-specific rules that are contained in the Safe Way manual (Rule Nos. 2000-2509), and rules specific to equipment handling operations (Rule Nos. 4001-4600).[3]

6.      Plaintiff received training from Defendant on the safety and operating rules that applied to his work.

7.      Plaintiff received training from Defendant at least every two years on the safety and operating rules that applied to his work.

8.      In order to maintain his employment with Defendant, Plaintiff needed to

---

[2]      Plaintiff states that he disputes this asserted fact "insofar as it implies that it is possible to follow each of CSX's workplace rules," further adding various additional facts and argument. (Dkt. No. 37, Attach. 2, at ¶ 4.)   Nevertheless, nothing in Plaintiff's statements disputes the asserted fact as stated, which is supported by Plaintiff's own deposition testimony.   (Dkt. No. 35, Attach. 2, at 42.)   This fact is therefore deemed to be admitted.

[3]      Plaintiff purports to dispute this fact on two grounds.   (Dkt. No. 35, Attach. 2, at ¶ 5.) First, he disputes it insofar as it implies that it is possible to follow each of Defendant's workplace rules, a statement that is not contained in (or responsive to) the asserted fact.   (*Id.*) Second, he asserts that the evidence on which Defendant relies to support the asserted fact, found at Dkt. No. 35, Attach. 3, was not produced to Plaintiff until the filing of the motion for summary judgment.   (*Id.*)   Plaintiff, however, offers no evidence to support this assertion.   The email to which Plaintiff cites indicates that Plaintiff notified Defendant that certain exhibits had not been produced to them prior to the summary judgment motion, listing Dkt. No. 35, Attachs. 4, 5, 33, and 34, yet they do not appear to have stated at that time that Dkt. No. 35, Attach. 3 had not been produced.   (Dkt. No. 37, Attach. 18, at 1, 3.)   Because Plaintiff has failed to show that the relevant Employee Operating Manual was not produced during previous discovery, that

4

continuously re-certify on Defendant's safety rules.

9.      Plaintiff received training on and was familiar with Defendant's Code of Ethics, a

fact he admitted during his deposition.

**Defendant's Disciplinary Policies**

10.     Defendant's disciplinary policy is called the "Individual Development and

Personal Accountability Policy" (or "IDPAP").

11.     Defendant's IDPAP policy was amended in 2018, with an effective amendment

date of September 24, 2018.[4]

12.     The version of the IDPAP prior to the 2018 IDPAP was in effect from July 8,

---

argument cannot serve as a basis for striking Defendant's asserted fact.

[4]      Plaintiff provides three bases on which he purports to dispute some aspects of the
asserted fact, but these challenges do not address the actual fact asserted.   (Dkt. No. 37, Attach.
2, at ¶ 11.)   Specifically, his adding information about his characterization of the supposed
content of the IDPAP does not address the asserted fact regarding when that policy was
amended, nor does he cite any evidence to support his characterization.   (*Id.*)   Further, in
seeking to strike this asserted fact, Plaintiff raises objections to Defendant's disclosure of Macon
Jones as a witness in this action, but Defendant does not appear to rely upon Mr. Jones' affidavit
or any other evidence specifically from Mr. Jones to support the asserted fact.   (*Id.*; Dkt. No. 35,
Attach. 35, at ¶ 11 [citing to Exh. C. of Dkt. No. 35].)   Lastly, Plaintiff asserts that the relevant
IDPAP policies were not produced by Defendant prior to filing its summary judgment motion.
(Dkt. No. 37, Attach. 2, at ¶ 11.)   The evidence cited by Plaintiff in support of this objection
does indeed indicate that Plaintiff had notified Defendant that such evidence had not been
previously produced, and that Defendant admitted that it indeed had not been produced.   (Dkt.
No. 37, Attach. 18, at 1, 3.)   However, the evidence cited by Plaintiff also indicates that
Defendant explained that (a) Plaintiff's discovery demands did not appear to seek the progressive
discipline policy, (b) it believed Plaintiff already possessed such evidence based on both
Plaintiff's previous related OSHA claim and the many times the policy had been discussed in
other relevant evidence including at various depositions, and (c) Plaintiff never informed
Defendant that he did not have that evidence despite multiple "meet and confer" conferences.
(Dkt. No. 37, Attach. 18, at 3-4.)   Because the evidence indicates that Plaintiff was aware of,
and had some familiarity with the IDPAP policies from various sources, the Court finds that any
failure to specifically produce the IDPAP documents previously has not prejudiced Plaintiff's
ability to respond to the summary judgment motion.   Because Plaintiff has not offered a valid
basis for either denying or striking this asserted fact, the asserted fact is deemed to be admitted.

2017, until September 24, 2018.[5]

13.     Plaintiff's disciplinary history overlapped these two policies, as he has documented disciplinary events dating from July 2018 through April 2019.[6]

14.     One relevant change made to the IDPAP when it was amended in 2018 was to reduce the length of discipline for a first-time rule violation.   Under the 2017 IDPAP, employees found to have committed a first serious offense were given a fifteen-day actual suspension, and a thirty-day suspension after a second offense.   After the 2018 amendment, employees were given a maximum one-day suspension for a first serious offense, and a maximum three-day suspension for a second serious offense.[7]

---

[5]     Plaintiff disputes this fact for the same reasons and to the same extent that he disputed the previous fact.   (Dkt. No. 37, Attach. 2, at ¶ 12.)   His challenges are insufficient to dispute the asserted fact for the same reasons discussed in Note 4.

[6]     Plaintiff's attempt to dispute the asserted fact is insufficient generally for the reasons discussed above in Note 4 of this Decision and Order.   Unlike the fact relevant to that Note, however, Defendant does cite the affidavit of Macon Jones in support of this asserted fact. Plaintiff has argued that, although Defendant disclosed Mr. Jones as a "hybrid" witness on June 30, 2021, that disclosure does not reference matters such as the amendments to the IDPAP, the number of days that can be imposed for a minor violation under those policies, the number of minor violations that can justify a termination under those policies, or the waiver process.   (Dkt. No. 37, Attach. 2, at ¶ 11.)   Plaintiff's objections to this disclosure are unfounded.   The disclosure that Plaintiff himself cites indicates that Mr. Jones may be called as a witness to present evidence under Federal Rules of Evidence 702, 703, and/or 705, and that the expected subject matter of his testimony would be "the applicable CSXT rules and policies that governed the implementation of discipline to Plaintiff, including application of the Individual Development of Personal Accountability Policy ('IDPAP') . . . ."   (Dkt. No. 37, Attach. 9, at 1.) It further discloses that Mr. Jones is likely to testify regarding the fact that the IDPAP is a progressive discipline policy that categorized violations into major and non-major offenses and includes progressive discipline steps, and that Plaintiff was subject to the IDPAP while employed by Defendant, among other topics.   (*Id.* at 1-3.)   This disclosure sufficiently covers the scope of the relevant parts of his affidavit on which Defendant relied when formulating the asserted fact, and therefore Plaintiff's objections to Mr. Jones' testimony do not constitute grounds to strike the asserted fact.

[7]     Plaintiff's attempt to dispute the asserted fact is insufficient generally for the reasons discussed above in Notes 4 and 6 of this Decision and Order.

**Application of Collective Bargaining Agreement to Disciplinary Procedures**

15.     Plaintiff, as a union employee, was subject to Defendant's IDPAP policy during his period of employment with Defendant.

16.     Both Plaintiff and Defendant were obligated to comply with the provisions of the collective bargaining agreement between Plaintiff's union and the railroad during his employment.

17.     Under the Collective Bargaining Agreement between Defendant and Plaintiff's union, "[n]o employee shall be disciplined without a fair hearing by a proper officer."[8]

**Defendant's Disciplinary Procedures**

18.     The first step in the disciplinary process is for a CSXT manager to record a description of the perceived rule violation, known as an "assessment."[9]

---

[8]     Plaintiff first argues that this asserted fact should be struck because the Collective Bargaining Agreement that Defendant cites in support of it was not produced to Plaintiff until the filing of the summary judgment motion.   (Dkt. No. 37, Attach. 2, at ¶17.)   However, this document (Dkt. No. 35, Attach. 6) is not one of those listed in the email and letter that Plaintiff cites in support of his assertion that the Agreement was not so produced.   (Dkt. No. 37, Attach. 18, at 1, 3.)   As a result, Plaintiff has not shown that Defendant failed to produce this evidence in a timely manner.   Further, Plaintiff attempts to dispute the asserted fact also on its merits, but merely adds facts and argumentation rather than citing evidence that actually disputes the fact. (Dkt. No. 37, Attach. 2, at ¶17.)   Such argumentation in response to the statement of material facts is improper.   *See Boger v. New York State Office of Parks, Recreation & Historic Preservation*, 17-CV-0289, 2019 WL 2766897, at *2 (N.D.N.Y. July 2, 2019) (D'Agostino, J.) (disregarding the party's introduction of immaterial facts and legal argument when responding to asserted facts).   Because Plaintiff has not cited evidence to dispute the asserted fact, this fact is deemed to be admitted.

[9]     Plaintiff states that he disputes this asserted fact "insofar as it implies that entering an assessment is something different from charging an employee with a workplace rule violation." (Dkt. No. 37, Attach. 2, at ¶ 18.)   This statement seems to be less an effort to dispute the asserted fact than to deny a perceived implication of that fact (i.e., an implication that an assessment is something different than charging an employee with a workplace rule violation, which is never asserted in the fact).   The summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts.   *See* N.D.N.Y. L.R. 7.1(a)(3) ("The non-movant's responses shall . . . admit[] and/or deny[] each of the movant's assertions in

19.     When an employee fails to comply with a rule, the observing manager enters the assessment with a description of the violation.[10]

20.     The assessment progresses to Defendant's Field Administration group to determine how to classify the assessment under Defendant's disciplinary policy.[11]

21.     Defendant issues a "charge letter" to the employee notifying him or her of the rules he/she is charged with violating and scheduling a hearing or "investigation" regarding the charges.

22.     Employees charged with rule violations have the right to be represented by their union at the hearing, present witnesses on their own behalf, and cross-examine Defendant's witnesses.[12]

23.     The UTU-CSXT Collective Bargaining Agreement states that "[a]t a reasonable time prior to the hearing the employee will be apprised of the precise charge against him and he shall have reasonable opportunity to secure the presence of necessary witnesses and shall have

---

matching numbered paragraphs.") (emphasis added); *Yetman v. Capital Dis. Trans. Auth.*, 12-CV-1670, 2015 WL 4508362, at *10 (N.D.N.Y. July 23, 2015) (citing authority for the point of law that the summary judgment procedure involves the disputation of asserted facts, not the disputation of implied facts).   As a result, this asserted fact is deemed to be admitted.

[10]     Plaintiff's attempt to dispute the asserted fact is insufficient generally for the reasons discussed above in Note 9.

[11]     Plaintiff's attempt to dispute the asserted fact is insufficient generally for the reasons discussed in Note 9.

[12]     Plaintiff disputes this asserted fact "insofar as it implies that the hearings are a neutral forum where an employee's responsibility for a supposed rule violation is fairly and independently determined."   (Dkt. No. 37, Attach. 2, at ¶ 22.)   This does not, however, address the fact asserted regarding the rights an employee has related to a disciplinary hearing.   This fact is therefore deemed to be admitted.

the right to be represented by counsel of his choosing."[13]

24.    The UTU-CSXT Collective Bargaining Agreement requires the hearing to be held within seven days "if possible."[14]

25.    A CSXT "hearing officer" rules on procedural objections and may question either side's witnesses.

26.    After the hearing, the hearing officer may issue non-binding findings regarding whether the charges were proven.[15]

27.    Discipline decisions are not made by an employee's immediate supervisor at the local level.[16]

---

[13]    Plaintiff argues both that this fact should be struck because it is premised on evidence not produced before the filing of the summary judgment motion, and that, in the alternative, this fact is disputed for the same reason asserted as to the previous fact.  (Dkt. No. 37, Attach. 2, at ¶ 23.) These arguments are both rejected for the reasons stated in Notes 8 and 12.

[14]    This fact is deemed to be admitted for the reasons discussed in Note 13.

[15]    Plaintiff disputes this asserted fact "insofar as it implies that anyone other than the frontline supervisor effectively determines whether and what severity of discipline an employee will receive for any given violation," while also adding a significant amount of additional facts and argumentation that is similarly unresponsive to the asserted fact.  (Dkt. No. 37, Attach. 2, at ¶ 26.)  Because such addition of facts and argumentation is improper under the Local Rules, this fact is deemed to be admitted.

[16]    Plaintiff disputes this fact, relying on a lengthy addition of facts and argumentation. (Dkt. No. 37, Attach. 2, at ¶ 28.)  To the extent that Plaintiff permissibly cites the deposition testimony of Robert Garofolo when asserting that Mr. Garofolo merely rubber-stamped many of the disciplinary recommendations forwarded to him, Mr. Garofolo testified that it was "labor relations" who made such disciplinary decisions in those instances, not the local supervisor. (Dkt. No. 35, Attach. 11, at 15-16.)  Although Plaintiff also argues that labor relations merely rubber-stamps the disciplinary charges found by the supervisors, the evidence he cites in support of such an assertion does not support that assertion.  (Dkt. No. 37, Attach. 17, at ¶ 4 [stating that although most hearings result in a finding upholding the disciplinary charge, some have resulted in the employee's exoneration].)  Although Plaintiff is certainly free to argue that the hearing process is a sham and that supervisors are the ones imposing discipline in effect, the evidence does not controvert the fact that, by the formal procedure under the Collective Bargaining Agreement, supervisors are not the persons who have the power to make formal disciplinary

28.     Discipline decisions are based on a review of facts and the investigation process to ensure compliance with the relevant collective bargaining agreement and consistent application of the IDPAP process throughout the CSXT system.[17]

## Cumulative Discipline Under the IDPAP

29.     Under the IDPAP, offenses for which discipline may potentially be assessed are classified as non-major or major offenses.

30.     The accumulation of non-major offenses within a short period of time, in addition to repeated violations of the same rule, will escalate an employee on the discipline schedule.

31.     Under the 2017 IDPAP, for a first non-major offense in a three-year period, employees found guilty of that offense after a formal hearing were given a 15-day actual suspension.[18]

32.     As to the rule violation Plaintiff was charged with in August 2018, that violation

---

decisions.   This fact is therefore deemed admitted.

[17]     Plaintiff disputes this asserted fact for the same reasons as he disputed the previous asserted fact; but that denial is insufficient.   (Dkt. No. 37, Attach. 2, at ¶ 29.)   Although Plaintiff has cited some evidence that may call into question the fairness of the relevant hearing procedures in practice, that evidence does not contradict the fact that the hearing process, even in Plaintiff's case, involved at least a nominal investigation and a review of the facts, or that hearings were held in an effort to comply with the Collective Bargaining Agreement, or that such process did not provide consistent application of the IDPAP process.   (*See* Dkt. No. 37, Attach. 17 [stating that, although the affiant believes the hearings are "nothing more than a kangaroo court," hearings were held and transcripts were forwarded for review, even if such review rarely resulted in exoneration].)   This fact is therefore deemed to be admitted.

[18]     Plaintiff appears to dispute this asserted fact based on his own characterization of the disciplinary policy, but cites no evidence to support that characterization.   (Dkt. No. 37, Attach. 2, at ¶ 32.)   Further, to the extent that Plaintiff relies on objections to the evidence cited based on when they were produced to Plaintiff and/or inadequate disclosure of the affidavit of Mr. Jones, those arguments are rejected for the same reasons in Notes 4 and 6.   This fact is therefore deemed to be admitted.

and the nature of discipline available to him was governed by the 2017 IDPAP.[19]

33.     The remainder of Plaintiff's disciplinary events occurred after September 24, 2018, and were all governed by the 2018 IDPAP.[20]

34.     Under the 2018 IDPAP, for a second non-major offense in a three-year period, employees found guilty of that offense after a formal hearing are given a three-day actual suspension.[21]

35.     Under the 2018 IDPAP, employees found guilty of a third non-major offense in a three-year period following a formal hearing are given a five-day actual suspension or dismissal.[22]

36.     Employees who commit three different non-major offenses within a three-year period are subject to dismissal under the 2018 IDPAP, which states that "[a]n employee who commits three (3) different non-major offenses within a period of three (3) years of compensated active service may be subject to dismissal."[23]

37.     Under the 2018 IDPAP, if the employe's subsequent non-major offense is the same as an earlier non-major offense, the offense will fall under Part II of the policy, which addresses major offenses that warrant removal from service prior to a hearing and allows for possible dismissal from employment.[24]

---

[19]     This fact is deemed to be admitted for the reasons discussed in Note 18.

[20]     This fact is deemed to be admitted for the reasons discussed in Note 18.

[21]     This fact is deemed to be admitted for the reasons discussed in Note 18.

[22]     This fact is deemed to be admitted for the reasons discussed in Note 18.

[23]     This fact is deemed to be admitted for the reasons discussed in Note 18.

[24]     This fact is deemed to be admitted for the reasons discussed in Note 18.

38.     The 2018 IDPAP states that "because repeated rule or policy offenses are concerning and require more significant handling, employees violating the same rule within the three (3) year rolling period will be considered repeat offenders and will be handled in accordance with Part II of the policy below."[25]

39.     Employees may be offered a "waiver" in some circumstances, which is the opportunity to admit a violation and waive the right to a formal hearing.

40.     A waiver will result in reduced discipline in comparison to the discipline imposed after a hearing and a determination that the employee committed the violation.

41.     Under both the 2017 IDPAP and the 2018 IDPAP, if the employee chooses a waiver for a first offense, the employee receives only a formal reprimand and no suspension.[26]

42.     Under the 2018 IDPAP, if the employee chooses a waiver when charged with a second offense, the employee is given a one-day actual suspension.[27]

43.     Under the 2018 IDPAP, employees charged with a third non-major offense in a three-year period do not have the option of a waiver.[28]

44.     An employee's injury record is not considered in determining the appropriate discipline for a rule violation.[29]

---

[25]     This fact is deemed to be admitted for the reasons discussed in Note 18.

[26]     This fact is deemed to be admitted for the reasons discussed in Notes 4 and 6.

[27]     This fact is deemed to be admitted for the reasons discussed in Notes 4 and 6.

[28]     This fact is deemed to be admitted for the reasons discussed in Notes 4 and 6.

[29]     Plaintiff disputes this asserted fact, but the rationale for that opposition relates to whether Defendant has a history of bringing charges against employees in retaliation for reporting a workplace injury; it does not address the asserted fact, which is that an employee's injury record will not be considered when determining the appropriate *discipline* for a charged rule violation. (Dkt. No. 37, Attach. 2, at ¶ 46.)   What constitutes the appropriate discipline for a given charge

## **Operational Testing**

45.     Railroads are required by federal regulations to conduct frequent safety

monitoring of their employees, also referred to as operational testing.

46.     Provisions under Title 49 of the Code of Federal Regulations require railroads to

periodically conduct operational tests and inspections to determine the extent to which

employees are complying with its rules.

47.     Plaintiff acknowledged that CSXT employees are subject to frequent safety

monitoring, which is primarily performed at a local level by immediate supervisors.

48.     More than one of Plaintiff's rules violations were observed during operational

tests.[30]

49.     If non-compliance with a rule is observed, the employee is assessed with an

operational test failure.

---

is dictated by the IDPAP and depends on three concrete factors: (1) whether the offense involved
is a major or a non-major charge; (2) whether the offense is the first, second, or third offense in a
three-year period; and (3) whether the employee took a waiver or requested a hearing.   (Dkt. No.
35, Attach. 3, at 3-4.)   Therefore, although Plaintiff has presented evidence that might suggest to
a reasonable juror that an employee would be charged with a rule violation as retaliation for
reporting an injury, it in no way suggests that reports of injuries will impact the level of
discipline imposed under the IDPAP if an employee is found guilty of such a charged offense.
This fact is therefore deemed to have been admitted.

[30]     Plaintiff argues that this asserted fact should be struck because the operational testing
data on which it relies was not produced to Plaintiff until the filing of the summary judgment
motion, and because Mr. Jones, on whose affidavit Defendant also relies, has not explained how
he has knowledge of this fact.   (Dkt. No. 37, Attach. 2, at ¶ 50.)   As to the operational testing
data, the evidence on which Plaintiff relies to support his point indicates that, although
Defendant had indeed not produced that specific chart related to operational testing previously, it
did provide the same data to Plaintiff as part of its production of Plaintiff's employment history,
in documents Bates marked STEVER-CSXT000552-554.   (Dkt. No. 37, Attach. 18, at 4.)
Because it appears Plaintiff had all the same data, even if not in the specific chart now relied
upon, his objection is baseless.   Moreover, this evidence sufficiently supports the asserted fact
regardless of any question of the basis for Mr. Jones' knowledge.   This fact is therefore deemed
to be admitted.

50.    Conducting operational tests is a regular part of a supervisor's responsibility in complying with Federal Railroad Administration ("FRA") rules and overseeing safety compliance.

51.    All CSXT employees are subject to frequent operational testing.

52.    Plaintiff is familiar with other employees who have been subject to operational testing and inspections and is aware that other employees have also been observed failing to comply with rules during operational tests.

53.    Because the nature and purpose of operational testing is to observe employees during the course of their work to determine if they are complying with safety rules, employees by design do not always know when a manager or supervisor is conducting the test.

54.    It is part of a supervisor's duty to perform operational testing on occasions when the employee is unaware that he or she is being observed, a fact that Plaintiff acknowledged at his deposition.

**<u>Reporting of Injuries</u>**

55.    Pursuant to Defendant's rules and policies, if an employee is injured during the course of his or her work, the employee is obligated to report the injury to his or her manager.[31]

56.    It is standard that when an employee is injured, once the injury is reported to the manager, paperwork is completed as required by the FRA and an investigation into the injury is conducted.

---

[31]    Plaintiff disputes this fact "insofar as it implies CSX actually wants employees to report their workplace injuries."   (Dkt. No. 37, Attach. 2, at ¶ 57.)   Setting aside the authorities proscribing denials of factual *implications* (*see, supra,* Note 9 of this Decision and Order), Plaintiff's objection represents legal argumentation that is not appropriate for disputing an asserted fact, and the evidence he cites regarding employees being discouraged from reporting injuries by certain managers does not dispute the asserted fact that reporting is nonetheless required under the applicable rules.   This fact is therefore deemed to be admitted.

**Plaintiff's Disciplinary History**

57.    Plaintiff was dismissed from employment in April 2019 after his fourth serious

rule violation in a nine-month period.[32]

*July 12, 2018, Assessment for Not Wearing Side Shields*

58.    On July 12, 2018, Plaintiff was observed during an operational test not wearing

side shields.[33]

59.    Following the operational test failure on July 12, 2018, Plaintiff was reprimanded

and issued an informal corrective instruction ("ICI").[34]

60.    Plaintiff's July 2018 operational test failure occurred before Plaintiff reported a

workplace injury in August 2018.

61.    Plaintiff's July 2018 operational test failure occurred before Plaintiff engaged in

any "protected activity."

62.    Trainmaster Josh Lynch was not involved in any manner with Plaintiff's July

---

[32]    Plaintiff disputes this fact to the extent it implies that he actually violated such rules. (Dkt. No. 37, Attach. 2, at ¶ 59.)   However, whether Defendant's conclusions that he had violated those rules were correct is not implicated by this asserted fact.   This asserted fact is therefore deemed to be admitted.

[33]    Plaintiff disputes this asserted fact for two reasons, the first of which is that he testified at his deposition that he did not recall there being such an incident on that date.   (Dkt. No. 37, Attach. 2, at ¶60.)   However, that Plaintiff lacks memory of a fact does not constitute evidence to dispute that fact.   *See Lopez v. Gerace*, 18-CV-0952, 2023 WL 7281653, at *10 (N.D.N.Y. Nov. 3, 2023) (D'Agostino, J.) (collecting cases).   Second, Plaintiff objects to Defendant's reliance on Mr. Jones' affidavit to support the asserted fact because Mr. Jones has no personal knowledge of the incident, but this objection ignores the fact that Mr. Jones appended a list of Plaintiff's history of operational testing, which includes a notation that Plaintiff failed operational testing for Rule 2009.8 on the relevant date.   (Dkt. No. 35, Attach. 34, at 7.) Category 2009 broadly covers personal protective equipment, clothing, hearing protection and jewelry.   (Dkt. No. 35, Attach. 3, at 6.)

[34]    This fact is deemed to be admitted for the reasons discussed in Note 33.

2018 operational test or assessing an operational test failure on the relevant date.

63.     Mr. Lynch played no role in any decision relating to discipline to be assessed to Plaintiff for the July 2018 operational test failure.

August 2, 2018, Rule Violation for Improperly Operating Wheel Handbrake

64.     Plaintiff was charged with violating Operating Rules 2104.8 and 2104.9 and the applicable system bulletins on August 2, 2018.

65.     Operating Rules 2104.8 and 2104.9 and the applicable system bulletins govern how to operate a vertical wheel brake and instruct the employee as to the proper positioning of his or her feet in the railcar's platform and the correct hand to use when applying the brake.

66.     At the time he operated the vertical wheel brake by hand, Plaintiff was aware of the proper procedure for applying a vertical wheel hand brake under the railroad's operating rules, a fact Plaintiff admitted during his deposition.

67.     Plaintiff received a charge letter dated August 8, 2018, giving him notice of an investigation and hearing, as well as of the safety violation with which he was charged.

68.     The August 2018 violation and the nature of discipline available for that violation were governed by the 2017 IDPAP.[35]

69.     Plaintiff was given the option of a waiver and was informed that he would be assessed with only a formal reprimand if he accepted that waiver.

70.     Plaintiff declined the waiver, and a hearing was held on August 21, 2018.

71.     During the hearing on August 21, 2018, Plaintiff was represented by his Union's

---

[35]     Plaintiff appears to dispute this asserted fact in some capacity, but that objection is insufficient for the reasons discussed in Note 18.   This fact is therefore deemed to be admitted.

Local Representative and was allowed to cross-examine witnesses and present evidence.[36]

72.     At the hearing on August 21, 2018, CSXT manager Josh Villegas testified that Plaintiff acknowledged to him that the way in which Plaintiff operated the hand brake was not compliant with the governing rules and that he would make sure to comply with the rule in the future.[37]

73.     Plaintiff testified at this hearing that he could not recall whether he had complied with the relevant rules or not, but he did not refute Mr. Villegas' testimony.[38]

74.     Plaintiff testified at that hearing that he believed the investigation into this incident was conducted in a fair and impartial manner.[39]

75.     Nick Wehrlin presided over the hearing on August 21, 2018, as the Hearing Officer and prepared and submitted the "Hearing Officer Findings."

76.     Mr. Wehrlin made "credibility determination" findings relating to Plaintiff's testimony and demeanor as a result of presiding over the hearing and observing Plaintiff's testimony.

77.     Plaintiff received a Notice of Discipline letter dated September 17, 2018, informing him that, based on the evidence presented at the hearing, it was determined that he

---

[36]     Plaintiff disputes this asserted fact "insofar that it implies that his hearing was a neutral forum where his responsibility for a supposed rule violation was fairly and independently determined," but this represents legal argumentation that is not appropriate for refuting the asserted fact.   (Dkt. No. 37, Attach. 2, at ¶ 74.)   This asserted fact is deemed to be admitted.

[37]     Plaintiff disputes this asserted fact, but that objection merely adds facts that are outside the scope of the asserted fact.   (Dkt. No. 37, Attach. 2, at ¶ 75.)   Because Plaintiff does not actually provide evidence to contradict the asserted fact, this fact is deemed to be admitted.

[38]     This fact is deemed to be admitted for the reasons discussed in Note 37.

[39]     This fact is deemed admitted despite Plaintiff's statement that he disputes it "insofar as it implies the hearing conducted in a fair and impartial manner," for the reasons discussed in

violated Transportation Rules 2104.8 and 2104.9.

78.    Plaintiff's August 2018 violation was a "Serious 1" level offense, and Plaintiff received a 15-day actual suspension under the 2017 IDPAP.

79.    Mr. Lynch was not on duty the day of Plaintiff's injury on August 2, 2018.

80.    Mr. Lynch played no role in investigating Plaintiff's injury on August 2, 2018.

81.    Mr. Lynch played no role in charging Plaintiff with a rule violation following his injury on August 2, 2018.

82.    Mr. Lynch played no role in the hearing on August 21, 2018.

83.    Mr. Lynch played no role in forming a decision that Plaintiff violated the safety rule.

84.    Mr. Lynch played no role in any decision relating to the discipline to be assessed to Plaintiff for the rule violation from August 2, 2018.

<u>December 24, 2018, Violation for Improper Footwear</u>

85.    Plaintiff was charged with a violation of Defendant's Transportation Rule 2009.13 relating to personal protective equipment ("PPE") in that he was wearing boots that did not have a defined heel on December 24, 2018.

86.    Rule 2009.13 requires that safety boots with a defined heel be worn when working outside of an office environment.

87.    It is the obligation of each CSXT employee to provide his or her own compliant footwear.

88.    Defendant does provide special protective winter gear, such as non-skid spikes and footwear that go over the top of the employee's boot to help protect workers during winter

Note 17.

conditions.

89.     On December 24, 2018, Mr. Lynch was distributing to employees spiked boots and attachments to protect employees walking in icy and snowy conditions in the railyard.[40]

90.     While meeting with Plaintiff and handing out protective equipment, Mr. Lynch observed that Plaintiff was wearing boots that were "completely flat, like a tennis shoes [sic] across the bottom of it."[41]

91.     Mr. Lynch testified that "when I looked at the boots, it immediately jumped out at me that there was absolutely no defined heel whatsoever."[42]

92.     Mr. Lynch worked with Plaintiff to remedy that situation before entering a rule violation assessment by giving Plaintiff time to change into another pair of boots if he had ones that were compliant with the defined heel rule.[43]

---

[40]     Plaintiff denies this asserted fact to the extent it implies that the interaction between Plaintiff and Mr. Lynch occurred as a result of Mr. Lynch *sua sponte* distributing footwear, citing evidence in which Mr. Lynch states that Plaintiff instead asked Mr. Lynch for that footwear.   (Dkt. No. 37, Attach. 2, at ¶ 93.)   For the sake of brevity, the Court will set aside the proscription against denying factual implications (*see, supra*, Note 9).   More important is the fact that there is no dispute that an interaction between Plaintiff and Mr. Lynch occurred regarding this winter footwear.   Any dispute as to who initiated that interaction is entirely immaterial to the issues in this case and the evidence cited does not contradict the asserted fact that Mr. Lynch was distributing such footwear, most relevantly to Plaintiff.

[41]     Plaintiff disputes the asserted fact, but his lengthy objection amounts to little more than legal arguments challenging the validity of the rule violation charge that are inappropriate in this context under the Local Rules.   (Dkt. No. 37, Attach. 2, at ¶ 94.)   *See Boger*, 2019 WL 2766897, at *2.   Because Plaintiff has not cited any evidence to dispute the asserted fact, that fact is deemed to be admitted, with alterations to better reflect the actual content of the cited portion of Mr. Lynch's testimony (i.e., he did not testify that he noticed Plaintiff's boots lacked a "defined heel," but rather that they were "completely flat").

[42]     This fact is deemed to be admitted for the reasons discussed in Note 41.

[43]     Plaintiff denies this asserted fact, implying without citation that Mr. Lynch's offer was not genuine, and citing to evidence that he did not believe his boots were non-compliant and that he had in fact worn those boots on other occasions on the job without incident.   (Dkt. No. 37,

93.     Plaintiff retrieved a different pair of boots from his car, but they "were in the exact same shape" as the first pair.[44]

94.     Mr. Lynch told Plaintiff that he needed to go and buy another pair of boots to continue working for the day.[45]

95.     Plaintiff was sent home because he did not have appropriate safety footwear and was not allowed to continue working in the yard without proper equipment under Defendant's Safe Way rules.[46]

96.     Plaintiff testified during his deposition that boots with a defined heel are required because when standing on a stirrup on the side of a rail car, the defined heel allows your foot to maintain positive contact with the stirrup and prevents your foot from sliding around.

97.     Mr. Lynch testified that the defined heel creates a "crevice" in the bottom of the boot between the heel and the sole that allows the boot to lock onto a ladder rung and keeps the employee safe when he is mounting and dismounting a rail car and when he is riding the side of

---

Attach. 2, at ¶ 96.)   None of these reasons or citations directly dispute the asserted fact, which is therefore deemed to be admitted.

[44]    Plaintiff denies the asserted fact for the same reasons as in Note 43, and those reasons are insufficient to dispute the asserted fact.   (Dkt. No. 37, Attach. 2, at ¶ 97.)   The evidence cited by Defendant in support of the asserted fact admittedly does not address what is contained in the asserted fact, but the deposition testimony of Mr. Lynch clearly does support that fact.   (Dkt. No. 35, Attach. 7, at 29:10-14.)   This fact is therefore supported by the evidence and Plaintiff has not cited evidence sufficient to dispute it.

[45]    Plaintiff denies the asserted fact by citing to evidence showing that he complied with what Mr. Lynch asked him, i.e., going to the store to buy a new pair of boots.   (Dkt. No. 37, Attach. 2, at ¶ 98.)   However, this denial does not address the asserted fact, which is that Mr. Lynch told him to go to the store to buy a new pair of boots.   Because Plaintiff's answer and evidence does not address the asserted fact, this fact is deemed to be admitted.

[46]    Plaintiff denies the asserted fact but supports that denial with legal argument and additional facts that do not serve as a proper basis for denial.   (Dkt. No. 37, Attach. 2, at ¶ 100.) This asserted fact is deemed to be admitted.

equipment; the defined heel keeps the feet from slipping off the equipment.

98. An observation failure was assessed against Plaintiff for not having compliant footwear.[47]

99. On December 27, 2018, Mr. Lynch communicated by email with managers Josh Villegas and Dustin Huppmann, who were on duty that day, to check on whether Plaintiff had obtained compliant boots, because Defendant's testing policy required a "48-hour follow-up test" and because Plaintiff had been instructed that he needed a Trainmaster to check that he was wearing compliant footwear before returning to work.[48]

100. The CSXT disciplinary policy applicable at the time of the December 2018 violation was the 2018 IDPAP.

101. Plaintiff received a charge letter dated December 26, 2018, which gave notice of the investigation and hearing and informed him of the rule he was charged with violating.

102. Plaintiff was offered the option of a waiver and informed that he would be assessed with only a one-day suspension if he accepted that, but he declined the waiver.

103. A hearing was held on December 31, 2018.

104. Plaintiff was represented at the hearing by his union's Local Chairman and was

---

[47]     Plaintiff disputes this fact "insofar as it implies that the assessment of an observation failure was something other than Lynch charging Stever with a workplace-rule violation."   (Dkt. No. 37, Attach. 2, at ¶ 103.)   Because this opposition does not address the asserted fact, but merely adds facts or argumentation regarding an implication, the asserted fact is deemed to be admitted.

[48]     Plaintiff denies the asserted fact, but rather than disputing that Mr. Lynch sent such an email, he argues that there is no evidence of any such policy.   (Dkt. No. 37, Attach. 2, at ¶ 104.) However, Mr. Lynch did testify at his deposition that such a policy exists.   (Dkt. No. 35, Attach. 7, at 67:3-7.)   To the extent that Plaintiff asserts such policy of a follow-up test was never produced, this appears to be an immaterial fact, as that follow-up does not appear to have impacted the relevant charge against him or the discipline he eventually received for that charge. This asserted fact is therefore deemed to be admitted.

allowed to present witnesses, testimony, and evidence during the hearing.[49]

105.    Mr. Lynch testified at the hearing regarding his observations of Plaintiff's boots from December 24, 2018.

106.    Photographs of Plaintiff's boots, with comparison photographs of compliant boots, were introduced as evidence and relied upon during the hearing.

107.    Mr. Lynch's role in the determination as to whether Plaintiff would be disciplined as a result of the hearing included reporting the observational failure and testifying at the hearing.[50]

108.    According to Mr. Lynch, nobody asked him his opinion as to whether Plaintiff should be disciplined related to the observation on December 24, 2018.[51]

109.    At the conclusion of the hearing, it was determined that Plaintiff violated Rule 2009.13, and he received a Notice of Discipline letter dated January 25, 2019, informing him of that decision.[52]

110.    Plaintiff's December 2018 violation was a "Serious 2" level offense and he was

---

[49]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 36.

[50]    Plaintiff disputes the asserted fact, citing to the fact that Mr. Lynch both made the charging decision and testified at the internal hearing.   (Dkt. No. 37, Attach. 2, at ¶ 112.) Because the wording of the asserted fact is somewhat ambiguous, it has been altered to reflect Mr. Lynch's role as supported by the evidence.   However, Plaintiff's objection to the asserted fact is rejected to the extent it seeks to argue that Mr. Lynch was the person who made the ultimate determination to find Plaintiff guilty of the charge, as such assertion is not supported by any cited evidence.

[51]    Plaintiff disputes this asserted fact, but cites no evidence, and indeed offers no concrete or specific reason to support that denial, which specifically addresses what Mr. Lynch testified. (Dkt. No. 37, Attach. 2, at ¶ 113.)   This asserted fact is therefore deemed to be admitted.

[52]    Plaintiff denies the asserted fact, but his opposition is not responsive to the asserted fact. This fact is therefore deemed to be admitted.

issued a three-day actual suspension.[53]

<u>January 1, 2019, Violation Involving a Shove Movement</u>

111.    Plaintiff was charged with violating CSXT Operating Rule 406.1 while involved with a shove movement on January 1, 2019.

112.    In railroad terms, a "shove" is the process of pushing a cut of cars or a train backwards, which generally results in restricted sightlines for the engineer who is operating the locomotive.   The conductor is on the ground and directing the engineer where to move the train; the conductor serves as the "eyes and ears" for the engineer and instructs the engineer where to go and how far to move.   Because the engineer's sightlines may be restricted, the safety of the move depends on the conductor's vigilance.[54]

113.    On January 1, 2019, Plaintiff was in the midst of protecting a shove movement when he was observed lighting a cigarette and talking with another employee.

114.    Mr. Lynch testified at the hearing that he observed Plaintiff having a conversation with another employee and turning his back on the locomotive to block the wind while lighting a cigarette at the same time he was involved in a shove movement.[55]

---

[53]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 52.

[54]    Plaintiff denies the asserted fact, but only to the extent that it is meant to imply that the engineer's sightline was impaired or restricted in the relevant incident that led to his being assessed with a violation.   (Dkt. No. 37, Attach. 2, ¶ 118.)   Setting aside the proscription against denying factual implications, this asserted fact does not address the relevant incident in particular, but rather the general nature of a shove movement.   Because this general description is supported by Plaintiff's own deposition testimony, cited by Defendant, this asserted fact is deemed to be admitted.

[55]    Plaintiff denies the asserted fact, objecting specifically to the assertion that he turned his back to the train.   (Dkt. No. 37, Attach. 2, at ¶ 120.)   However, Mr. Lynch did testify, contrary to Plaintiff's assertion, that he observed that Plaintiff "turned his back to the shove to block the wind."   (Dkt. No 35, Attach. 9, at 7.)   Further, Plaintiff's citation to evidence that he did not lose sight of the train during the shove does not contradict the actual fact asserted, which is that

115.    Mr. Lynch testified at the hearing that the other employee with whom Plaintiff was having a conversation at the relevant time admitted to Mr. Lynch that Plaintiff violated the rule and was engaging in unrelated tasks.[56]

116.    CSXT Operating Rule 406.1 states that employees must not engage in unrelated tasks when involved in a shove movement.

117.    Plaintiff testified during his deposition that he was aware of the rule and was aware of his responsibility as conductor in protecting the shove movement.

118.    The company disciplinary policy applicable at the time of the January 2019 violation was the 2018 IDPAP.

119.    Plaintiff received a charge letter dated January 2, 2019, giving notice of the investigation and hearing related to this charge.

120.    A hearing was held on January 9, 2019, at which Plaintiff was represented by his union's Local Chairman and Vice Local Chairman, and he was allowed to present witnesses,

---

Mr. Lynch observed him turning his back to the train.   Because the evidence supports that this is what Mr. Lynch testified that he observed, this fact is deemed to be admitted.

[56]    Plaintiff argues that the asserted fact should be struck, relying on pages of legal arguments.   (Dkt. No. 37, Attach. 2, at ¶ 121.)   The only of these arguments that merits being addressed at this stage is his assertion that the Court should not rely on the hearing testimony Defendant cites because (1) that coworker did not actually testify and his reported statements are hearsay, and (2) Mr. Lynch did not indicate the specific words the coworker used but instead merely summarized his report.   (*Id.*)   However, neither of these represents a reason to decline to rely on the evidence presented.   Indeed, evidence on a motion for summary judgment need not be admissible, but merely must be capable of production in an admissible form if relied upon at trial.   *See Bowling v. Nolette*, 18-CV-0597, 2021 WL 4134733, at *7 n.3 (N.D.N.Y. Sept. 10, 2021) (Suddaby, C.J.) ("[E]vidence considered on a motion for summary judgment need not be in an admissible form, so long as it 'can be presented in a form that would be admissible in evidence.'") (citing Fed. R. Civ. P. 56[c][2]).   Because Defendant could have the coworker himself provide testimony at any eventual trial, there is no reason to disregard Mr. Lynch's testimony from the hearing.   This fact is therefore deemed to be admitted.

testimony, and evidence during the hearing.[57]

121.    After that hearing, Plaintiff received a Notice of Discipline letter dated February 8, 2019, informing him that he was found to have violated Rule 406.1.

122.    Plaintiff's January 2019 violation was a "Serious 3" level offense and he was given a five-day actual suspension.

123.    Despite having been disciplined for three non-major offenses within a three-year period, Plaintiff was given a suspension rather than a dismissal.

124.    Plaintiff admitted during his deposition that he had lit a cigarette and had been talking to another employee while engaged in protecting the shove movement.

125.    Plaintiff testified during his deposition that he could not recall if he had turned his back to the shove.

<u>February 8, 2019, Operational Test Failure for Not Wearing Side Shields</u>

126.    On February 8, 2019, Plaintiff was observed during an operational test not wearing side shields on his glasses while working in the railyard.

127.    Plaintiff testified during his deposition that, at the time of his operational test failure in February 2019, he knew that CSXT's safety rules required him to wear side shields on his glasses while working in the railyard.

128.    As a result of that failure, Plaintiff was issued an ICI.

129.    The February 2019 operational test failure was Plaintiff's second violation of the safety rule requiring side shields on glasses.[58]

130.    Mr. Lynch was not involved with the operational test or assessing an operational

---

[57]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 36.

[58]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 33.

test failure on February 8, 2019.[59]

<u>March 10, 2019, Incident</u>

131.    In 2019, Defendant had equipped a certain number of its locomotives with cameras that face inside the cab at the crew operating the locomotive.

132.    CSXT's Safety Department uses the inward-facing cameras to monitor the safety procedures of the crews operating its locomotives and to conduct operational tests of the locomotive crew.

133.    The practice of using inward-facing cameras to conduct operational tests of a train's crew applies nationwide throughout the entire CSXT operating system and was not specific to Plaintiff or even to his region.

134.    The union representing the railroad employees, and the employees themselves, were notified that these inward-facing cameras were in position on locomotives and were intended to be used for operational testing of the train's crew.

135.    Plaintiff admitted during his deposition that CSXT's Safety Department uses the inward-facing cameras to monitor the safety procedures of the crews operating its locomotives, and that the practice applies nationwide throughout the entire CSXT operating system.

136.    Defendant uses a system of random selection to determine which videos will be reviewed for operational testing.[60]

---

[59]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 30.

[60]    Plaintiff disputes this asserted fact, arguing that the evidence establishes that random selection is not the only way in which videos are pulled for review.   (Dkt. No. 37, Attach. 2, at ¶ 143.)   Plaintiff's attempts to make legal arguments regarding conclusions to be drawn from the lack of clear evidence establishing that his video was pulled randomly are not only improper for disputing a statement of fact, but also not supported by the evidence he cites.   Specifically, Plaintiff argues that review is done either on a random basis or by a manager's request, but the evidence he cites does not support his implication that managers can request videos of any

137.    Plaintiff testified during his deposition that his understanding is that footage from the inward-facing cameras is selected at random and he does not have any reason to dispute or disagree with that understanding.

138.    Ben Kirkland, a safety data analyst employed at Defendant's headquarters in Jacksonville, wrote a computer code that would randomly select a locomotive from a list of all active locomotives equipped with inward-facing cameras.

139.    The computer code then randomly selects an approximate two-minute segment from that video for Safety Department personnel to view to conduct an operational test of the crew.

140.    The "randomized algorithm" developed by Mr. Kirkland implements a process for selecting the videos to be used for operational testing of the crew in a consistent manner.

141.    Mr. Kirkland testified at his deposition that, because of how this random selection process was designed, it is not possible for the algorithm driving the operational-testing selection procedures to be used to target a specific employee or to find and select a locomotive that a specific employee was operating.[61]

---

employee at any time for any reason.   Rather, the cited deposition testimony from Steven Ammons and Ben Kirkland indicates that targeted pulling of specific video occurs where there is a need to investigate a known accident or incident involving the specific locomotive at a specific time, such as a crossing incident or major derailment.   (Dkt. No. 35, Attach. 22, at 15-16; Dkt. No. 35, Attach. 23, at 15, 20-21.)   Plaintiff notably does not cite any evidence supporting his assertion that a manager could request a specific video of a specific employee related to *routine operational testing*, which is the subject of the asserted fact.   Because Plaintiff has not cited evidence which shows that review of video for the purposes of operational testing specifically was not pursuant to a random selection system, this asserted fact is deemed to be admitted.

[61]    Plaintiff disputes this asserted fact, citing Mr. Kirkland's answer of "I don't know" in response to a question regarding whether there was anything to prevent a manager from asking the safety department for video of a specific train at a specific time by falsely stating there had been an incident.   (Dkt. No. 37, Attach. 2, at ¶ 143.)   However, this objection is not responsive to the asserted fact or the testimony from Mr. Kirkland cited by Defendant, which addresses

142.    Steven Ammons, Director of Train Handling Rules and Practices, testified that, at the time of this incident in 2019, approximately only 200 to 300 out of a fleet of approximately 3,000 locomotives were equipped with inward-facing cameras.

143.    Mr. Ammons testified that, out of the small number of trains equipped with cameras, fewer had the equipped locomotive in the lead position where a live crew could be observed operating the train.

144.    Mr. Kirkland testified that he initially viewed the randomly selected videos to make sure they were from a lead locomotive that was being operated by a live crew, and would disqualify any selected video if no one was on the locomotive.

145.    Once the video was verified, a link was then sent to a separate department in Jacksonville, the Operating Practices group, to inform them that a video was available to be viewed or audited.

146.    Plaintiff admitted during his deposition that he does not dispute that the videos are audited by personnel in Jacksonville and does not dispute that no managers in the field (such as a crew's direct managers in Syracuse) are involved in that process.

147.    The Safety Department views the videos to look for any type of safety-related incident or infraction.

148.    If the Safety Department employee in Jacksonville observes a safety violation committed by a member of the crew on that video, that person then determines the identity of the crew member who committed the violation, writes up a report, and sends that report to the employee's supervisors.

_____

whether the process by which the operational testing selections are made (i.e., the randomized selection algorithm Mr. Kirkland discussed) can be used to target a specific employee.   This fact is therefore deemed to be admitted.

28

149.     On March 10, 2019, Plaintiff was working as a road conductor on a locomotive going from Selkirk to Syracuse.

150.     Plaintiff was sitting in the cab of the locomotive, along with the train's engineer, as it travelled to Syracuse.

151.     Plaintiff testified that the locomotive he was operating was equipped with an inward-facing camera, which pointed towards the inside of the cab at the two-person crew operating the locomotive.

152.     The Operating Practices employee received and reviewed footage randomly selected from the locomotive Plaintiff was operating.[62]

153.     The Operating Practices employee was tasked with viewing that randomly selected video to audit whether the train crew was complying with safety rules.[63]

154.     Taylor James was the Operating Practices employee in Jacksonville who audited the inward-facing camera and identified Plaintiff as the one committing the safety infractions on the video.

155.     Footage downloaded from the inward-facing camera on the locomotive where

---

[62]     Plaintiff denies this asserted fact, but offers nothing but legal argument to support his denial.   (Dkt. No. 37, Attach. 2, at ¶ 159.)   Plaintiff notably relies in part on an email from Mr. Ammons to support his theory that the relevant video was not randomly selected, but rather as the result of an improper request by Mr. Lynch; in that email, Mr. Ammons asks how the video was found, to which there does not appear to have been a response.   (Dkt. No. 37, Attach. 19.) However, at his more-recent deposition, Mr. Ammons, as highlighted by Defendant, testified that Plaintiff's relevant conduct violation had been discovered "[t]hrough a random audit or review of the inward-facing camera system."   (Dkt. No. 35, Attach. 22, at 15:3-8.)   Because Plaintiff has offered nothing but subjective interpretation and speculation to contradict Mr. Ammon's testimony that the video was obtained as part of the random selection process, this fact is deemed to be admitted.

[63]     Plaintiff's dispute that the video selection was not made at random is insufficient for the reasons discussed in Note 62.

Plaintiff was working was interpreted by Mr. James and others as showing an employee not wearing side shields on his glasses and smoking a cigarette in the cab of the locomotive.[64]

156.    Mr. James identified the rules violations based on the conduct he observed on the footage and then identified that it was Plaintiff who was the employee in the video committing those rules violations.[65]

157.    Mr. James had no idea who Plaintiff was or what his background was.

158.    Screenshots were captured from the video showing Plaintiff violating these safety rules and inserted into an INWARD-FACING CAMERA OPERATIONAL TEST REVIEW ("IFC Operating Test") report that was sent to Plaintiff's supervisors in Syracuse.

159.    Plaintiff admitted during his deposition that he is the person shown in those screenshots.

160.    Plaintiff admitted during his deposition that the picture shows him smoking in the cab of the locomotive.

161.    Plaintiff admitted during his deposition that he in fact was smoking in the cab of the locomotive.

162.    Plaintiff admitted during his deposition that he does not remember whether he

---

[64]    Plaintiff denies the asserted fact, citing his own testimony from the hearing related to this charge in which he states that he believes the pictures do not clearly show that he is not wearing side shields, although he also admitted that he did not remember for certain whether he was or not.  (Dkt. No. 37, Attach. 2, at ¶ 162; Dkt. No. 35, Attach. 4, at 27-28.)   Plaintiff similarly testified at his deposition that he does not remember if he was wearing side shields at the relevant time.  (Dkt. No. 35, Attach. 2, at 59.)   Based on the evidence in the record, Plaintiff's subjective interpretation of pictures and lack of memory are insufficient to contradict the fact that Defendant's relevant employees and the hearing representatives all interpreted the video as showing Plaintiff failing to wear side shields.   This fact is therefore deemed to be admitted, with some clarification.

[65]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 64.

was wearing side shields.[66]

163.     Plaintiff admitted during his deposition that, when he committed these violations, he was familiar with and aware of Defendant's rule that prohibits smoking in locomotive cabs.

164.     Plaintiff also admitted during his deposition that, at the time he committed these violations, he was familiar with and aware of Defendant's rule that requires safety glasses with side shields to be worn at the relevant time on the locomotive.

165.     Based on the rule violations observed on that video, Plaintiff received a charge letter notifying him that he was charged with smoking on the locomotive and failing to wear side shields on his glasses.[67]

166.     A hearing was held in March 2019, at which Plaintiff was represented by his union's Local Chairman and was allowed to present his own witnesses, testimony, and evidence.

167.     At the conclusion of the hearing, Plaintiff was found to have violated CSXT Transportation Rules 107.2 and 2009.8, and he received written notice of the results of that hearing.

168.     Plaintiff's rules violation was a "Serious 3" level offense under CSXT's discipline

---

[66]     Plaintiff disputes this asserted fact.   (Dkt. No. 37, Attach. 2, at ¶ 169.)   Defendant's citation to Plaintiff's deposition testimony does not support its assertion that Plaintiff admitted the video shows him failing to wear side shields; rather, Plaintiff merely admitted that "the guy from Jacksonville . . . said that [he was] not wearing side shields."   (Dkt. No. 35, Attach. 2, at 58:19-22.)   In both his hearing testimony and his deposition testimony, he stated that he did not remember whether he was wearing side shields, and at the hearing he specifically testified that he disagreed that the video could be reasonably interpreted as showing he was not wearing side shields.   (Dkt. No. 35, Attach. 2, at 59; Dkt. No. 35, Attach. 24, at 27-28.)   Because the evidence cited by both parties supports as an undisputed fact that Plaintiff simply did not remember whether he was wearing side shields, the asserted fact has been altered to reflect the evidence.

[67]     Plaintiff denies the asserted fact, but his objection merely adds facts that are not responsive to the asserted fact.   (Dkt. No. 37, Attach. 2, at ¶ 172.)   This fact is therefore deemed to be admitted.

policy.

169.    Defendant's Labor Relations Arbitration and Discipline group was involved in
reviewing the "Serious 3" level charges in both January 2019 and March 2019 because both
violations subjected Plaintiff to dismissal.[68]

170.    The Arbitration and Discipline Group recommended that Plaintiff be dismissed as
a result of the violation that took place on March 10, 2019.

171.    On April 25, 2019, Defendant's Field Administration emailed Robert Garofolo,
the Superintendent at Selkirk, asking for a decision on Plaintiff's discipline and confirmed that
Labor Relations had already recommended dismissal.[69]

172.    As Mr. Garofolo testified, the decision to terminate Plaintiff for these rule
violations was made by him upon the recommendation of Defendant's Labor Relations
personnel:

> Q:    Did you play any role in the dismissal referenced in this letter?
> A:    Yes, sir.
> Q:    Okay.   What was your role in the dismissal?
> A:    I agreed to the termination of this employee based on the
>        recommendation from labor relations and the – reading the
>        transcripts of the hearing that was held.[70]

173.    Mr. Garofolo testified that he reviewed both the hearing transcript and the

---

[68]    Plaintiff disputes this assert fact "insofar as it implies labor relations reviewed the
transcript from his hearing to ensure anything other than that the collective bargaining's
procedural requirements were satisfied."   (Dkt. No. 37, Attach. 2, at ¶ 177.)   However, this
represents little more than a legal argument without citation to evidence directly addressing or
contradicting the asserted fact, and as such, this asserted fact is deemed to be admitted.

[69]    Plaintiff does not dispute the asserted fact, but merely adds unrelated facts.   (Dkt. No.
37, Attach. 2, at ¶178.)

[70]    Plaintiff denies the asserted fact, but he fails to cite evidence that addresses that fact and
instead relies on legal argumentation.   (Dkt. No. 37, Attach. 2, at ¶ 179.)   This asserted fact is
therefore deemed to be admitted.

recommendation from Labor Relations when considering whether discipline should be imposed.[71]

174.    As Mr. Garofolo testified, he agreed with Labor Relations' recommendation that dismissal was appropriate because of where Plaintiff was within Defendant's progressive discipline under the IDPAP:

> Labor relations gave me the recommendation.   And it was due to him walking himself through the disciplinary policy, in which so many infractions occur in a certain amount of time, it's up to and including dismissal.   And he had walked himself to the termination side.[72]

175.    Mr. Garofolo testified that he did not review Plaintiff's employment history when making the decision to dismiss Plaintiff.

176.    Mr. Garofolo testified that, by the time of his deposition, he had no independent recollection of being made aware that Plaintiff had suffered a workplace injury, although he also testified that, in general, he is notified and kept updated regarding injuries and investigations into injuries.[73]

177.    Plaintiff received a letter from Mr. Garofolo, informing him of his dismissal.

178.    Plaintiff admitted during his deposition that he does not believe that he has ever

---

[71]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 70. However, it has been somewhat altered here to more accurately reflect the content of Mr. Garofolo's testimony upon which Defendant relies.

[72]    Plaintiff denies the asserted fact but points only to previous citations and arguments that have already been found to be insufficient to support his objections.   (Dkt. No. 37, Attach. 2, at ¶ 181.)   This asserted fact is therefore deemed to have been admitted.

[73]    Plaintiff denies the asserted fact, but this denial merely adds additional facts without truly disputing what has been asserted.   (Dkt. No. 37, Attach. 2, at ¶ 183.)   The Court has, however, added some additional context to better represent the substance of the relevant testimony from Mr. Garofolo.

spoken to or crossed paths with Mr. Garofolo and has no reason to believe that Mr. Garofolo knew who he was, knew that he had reported an injury, or knew that he was injured in August 2018.

179.    Plaintiff admitted during his deposition that he does not know whether Mr. Garofolo was the person that made the final decision that his rule violations warranted dismissal.[74]

180.    Plaintiff admitted during his deposition that he has no reason to believe that Taylor James knows him and agreed that Mr. James probably has no idea that he had reported a work injury.

181.    The Safety Department employees who were tasked with watching the inward-facing camera videos had no discretion or authority not to inform the employee's managers once they observed the employee committing a rule violation.

182.    Mr. Lynch played no role in observing or charging Plaintiff with the March 2019 rules violation observed on the inward-facing camera, although he did serve as the hearing officer at Plaintiff's hearing on that charge.[75]

183.    Employees not wearing proper eyewear or side shields is a "very common thing" that the Safety Department sees in its operational test video reviews, and they address such

---

[74]    This asserted fact has been altered somewhat from the version presented by Defendant, because Defendant's original assertion that Plaintiff "admitted . . . that he has no idea who was involved in making the determination that these rules violations warranted dismissal" requires an interpretation of the cited testimony that may not be supported by that evidence.   (Dkt. No. 35, Attach. 35, at ¶ 186.)

[75]    Plaintiff denies this asserted fact, but his objection consists primarily of legal argumentation.   (Dkt. No. 37, Attach. 2, at ¶ 189.)   Additional, undisputed context has, however, been added to the asserted fact.

violations or "send to the managers to address."[76]

184.    Manager Michael Noviky testified that, although he "always took [smoking in the cab of a locomotive] serious [sic]" and that there is "a no tolerance for it," he also acknowledged that, to his recollection, it is "a minor infraction that I would write up."[77]

185.    Mr. Ammons testified that, when his group observes an IFC video of a crew member smoking on a locomotive, "every single time were see [sic] that, whether it's a cigarette [or] an electronic cigarette, we send the alert out to the manager to handle."[78]

**OSHA and Public Law Board Determinations Regarding Plaintiff's Dismissal**

186.    On October 22, 2019, Plaintiff filed a complaint with OSHA, alleging a violation of the FRSA.   OSHA conducted an investigation of Plaintiff's complaint under the FRSA and issued investigation findings.

187.    OSHA's findings provide the following conclusions:

> Respondent contends Complainant was dismissed for legitimate, non-retaliatory reasons and Complainant's injury reporting did not contribute to his termination in any way.   Respondent's progressive disciplinary plan calls for employees violating the same rule within a three-year rolling period to be considered repeat offenders and the violations to be considered as major offenses. According to Respondent policy, major offenses are those that warrant dismissal from service.   Between July 2018 and February 2019, Complainant was witnessed and disciplined for no less than four safety violations, two of which involved not wearing side

---

[76]    Plaintiff disputes this asserted fact, but his opposition is not responsive to the fact.   (Dkt. No. 37, Attach. 2, at ¶ 190.)   However, the asserted fact has been reformulated to more accurately reflect the content of the evidence cited in support of that fact.

[77]    Although Defendant's asserted fact is supported by the cited testimony, the Court has added context from the same portion of his testimony in order to reflect an accurate picture of how such violations were viewed according to Mr. Novicky.

[78]    This asserted fact is deemed to be admitted for essentially the same reasons discussed above in Note 77.

shields on his safety glasses.   On March 11, 2019, the Operating
Practices Supervisor observed a video from the locomotive camera
of the previous day where Complainant was not wearing side
shields for the third time, had the window open and was smoking
in the cab of the locomotive.   Respondent contends Complainant's
major offense warranted dismissal from service.   Evidence
supports Respondent's defense.   Respondent has shown by clear
and convincing evidence, Complainant's protected activities did
not contribute to the adverse action and that there is not reasonable
cause to believe Respondent violated FRSA.[79]

188.   Plaintiff appealed the decision to the Public Law Board.

189.   During that appeal to the Public Law Board, Plaintiff was represented by his

Union's Chairman.

190.   The Public Law Board decision provides the following conclusions:

Relative to the discipline of dismissal assessed in this case, the
Carrier notes that under its IDPAP an employee may be dismissed
for committing three serious offenses within a three year period
and that this case represents the Claimant's third serious offense
within eight months.   The Organization strenuously argues that
the discipline was harsh and excessive.   Upon its review of the
entire record, the Board finds that the Claimant, in his relatively
short tenure with the Carrier, has demonstrated that he is unwilling
or unable to perform his duties in full compliance with the
Carrier's rules.   Accordingly, the Board finds that the discipline of
dismissal was not arbitrary or excessive, and will not be disturbed
by the Board.[80]

**Plaintiff's Allegations Relating to Being "Birddogged"**

---

[79]     Plaintiff argues that this asserted fact should be stricken because OSHA's findings are
inadmissible given that this Court must review the issues here *de novo*.   (Dkt. No. 37, Attach. 2,
at ¶ 197.)   While it is true that the OSHA decision (and the Public Law Board findings, which
will be discussed later) have no legal effect for the purposes of this motion, the Court is
well-aware of that fact, and acknowledgment of the existence and content of those findings does
not require affording those findings any weight or deference as to their ultimate conclusions.   To
the extent that Plaintiff believes that introduction of such evidence at trial would be unduly
prejudicial, he may raise such objections at a more appropriate time.

[80]     Plaintiff's objections to the asserted fact are rejected for the reasons discussed in Note 79.

36

191.    Plaintiff claims that Mr. Lynch was the CSXT manager that "birddogged" him by following him around the yard looking for opportunities to charge him with rule violations.

192.    Plaintiff provided the testimony below that Mr. Lynch was the one and only CSXT manager who he alleges "birddogged" him, and that no other CSXT manager or employee did so:

> Q:    Can you tell me every CSXT employee or CSX manager who you believe birddogged you?
> A:    Specifically, I believe that Lynch was the one specifically that was birddogging me.
> Q:    Do you believe anyone other than Josh Lynch birddogged you?
> A:    No.
> Q:    So your claim is that Josh Lynch and only Josh Lynch was the CSX manager who was birddogging you?
> A:    Yes.

193.    Plaintiff worked under several other managers and supervisors during his employment with Defendant but does not allege that any of them engaged in any "birddogging" other than Mr. Lynch.

194.    During his deposition testimony, Plaintiff described his "birddogging" allegation as one that, after he returned to work following his injury, he was "followed" by Mr. Lynch in the railyard with the purpose to observing whether he was complying with safety rules.

195.    Managers other than Mr. Lynch conducted operational tests of Plaintiff after Plaintiff's October 2018 injury.

196.    Managers other than Mr. Lynch who conducted operational tests of Plaintiff after October 2018 assessed him as failing during some of those tests.[81]

197.    Mr. Lynch conducted operational tests of Plaintiff after his October 2018 injury

---

[81]    Plaintiff argues that this asserted fact should be struck based on his previous objections to the evidence cited by Defendant.   (Dkt. No. 37, Attach. 2, at ¶ 207.)   Those arguments are rejected for the reasons discussed above in Note 30.

wherein he found that Plaintiff complied with all rules during that testing period.[82]

198.    During operational testing conducted after October 2018, Mr. Lynch found Plaintiff to be in compliance with safety rules more than twice as often as he found him to have been in violation.[83]

### Management Compensation

199.    There is no evidence that Plaintiff's managers have received negative feedback or a lower "ranking" because of an injured employee.[84]

200.    Michele Ross, CSXT's Senior Director of Human Resources, testified at her deposition that, under CSXT's Management Incentive Compensation Plan ("MICP"), all management employees who partake in the plan are eligible to receive a bonus depending on how the company performs.

201.    Ms. Ross testified that injuries do not play any role in an individual manager's personal goals.[85]

202.    Ms. Ross testified that injuries do not affect bonus compensations.[86]

---

[82]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 81.

[83]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 81.

[84]    Plaintiff denies this asserted fact, citing statements from Josh Villegas, Taylor James, and Nicholas Wehrlin to the effect that they all had a belief or understanding that injuries reported by employees they supervised could cause them negative consequences.   (Dkt. No. 37, Attach. 2, at ¶ 211.)   However, none of this evidence supports a finding that any of these managers actually received negative feedback or a lower ranking based on employee injuries, merely their understanding that it might have such an effect.   This fact is therefore deemed to be admitted.

[85]    Plaintiff denies this asserted fact, arguing that there is evidence that contradicts her testimony.   (Dkt. No. 37, Attach. 2, at ¶ 213.)   However, the asserted fact is merely regarding what Ms. Ross testified, not whether that testimony is correct.   Because Plaintiff's denial does not address the asserted fact, this fact is deemed to be admitted.

[86]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 85.

203.    Ms. Ross testified that injuries do not affect a manager's ability to be promoted.[87]

204.    Ms. Ross testified that "[t]here isn't any correlation between an injury that may occur under a manager and their performance management rating."[88]

205.    Ms. Ross testified that "there isn't an individual manager component that's tied to the number of injuries that he or she may have that then drives their performance management."[89]

**Treatment of Other Employees**

206.    Defendant produced data relating to the discipline of other employees, specifically employees from CSXT's Northeast Division who were charged with three or more violations during the preceding three-year period, the last of which was a "Serious 3" or "Major" incident, and who did not accept a waiver for charges.[90]

---

[87]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 85.

[88]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 85.

[89]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 85.

[90]    Plaintiff argues both that this asserted fact should be struck because Defendant failed to produce the cited evidence before filing its motion for summary judgment and that the employees listed in this evidence are not similarly situated to him.   (Dkt. No. 37, Attach. 2, at ¶ 218.)   As to Plaintiff's first argument, a cover letter appended to the relevant exhibit indicates that this evidence was provided to Plaintiff by email on April 26, 2022, well before the filing of the motion for summary judgment.   (Dkt. No. 35, Attach. 33, at 2.)   When Plaintiff raised on October 2, 2022, that he apparently had not received this email, Defendant responded by stating in a letter dated October 5, 2022, that it had forwarded the original email to Plaintiff the day before.   (Dkt. No. 37, Attach. 18, at 1, 3.)   Although Plaintiff then responded that he had not received the forwarded email either, there is no evidence to suggest that Defendant did not in fact send both the original email in April 2022 or the forwarded email in October 2022.   (Dkt. No. 37, Attach. 18, at 5-6.)   Under the circumstances, the Court finds no reason to strike the asserted fact on the basis of the alleged non-production by Defendant.   Further, even if Plaintiff reviewed this evidence for the first time when he received the summary judgment motion, his arguments make clear that he has had a sufficient opportunity to consider and respond to that evidence.   As to Plaintiff's denial of the asserted fact on its merits, whether these employees are similarly

207.    This list comprises 48 such employees.[91]

208.    Of those 48 employees, 39 were separated from employment as part of the disciplinary process, with 34 of those 39 employees being directly terminated from employment and the remaining five employees either resigning or retiring before the final discipline was imposed.[92]

209.    Nine of the 48 employees were not dismissed from service with the railroad.[93]

210.    Of the 39 employees who were either dismissed or resigned/retired, 22 had no previous injury.[94]

211.    Of the nine employees who were not dismissed from employment, three of those employees had reported a prior workplace injury.[95]

212.    Of the 20 employees who have reported a previous injury, 14 experienced the relevant disciplinary event more than three years after suffering the injury.[96]

### C.    Parties' Arguments on Defendant's Motion for Summary Judgment

#### 1.    Defendant's Memorandum of Law

Generally, in its motion for summary judgment, Defendant asserts four arguments.   (Dkt. No. 35, Attach. 36.)   First, Defendant argues that Plaintiff cannot show that his report of his

---

situated with Plaintiff is a legal conclusion and thus such language has been stricken from the asserted fact.

[91]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 90.

[92]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 90.

[93]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 90.

[94]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 90.

[95]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 90.

[96]    This asserted fact is deemed to be admitted for the reasons discussed above in Note 90.

injury was a contributing factor in his ultimate termination.   (*Id.* at 28-36.)   Specifically, Defendant argues that there is no temporal proximity between his report of the injury and his termination because his termination occurred more than seven months after his injury report, and because his assessed rule violations were an intervening event that severs any potential implication of a connection between his injury report and his termination.   (*Id.* at 30-31.) Defendant argues that the undisputed evidence establishes that Plaintiff was found to have violated multiple safety rules at various times both before and after when he reported his injury, and that there is sufficient evidence to show that Defendant had a valid basis to find Plaintiff had committed such violations.   (*Id.* at 31-33.)   Defendant further argues that there is no evidence to show that it applied its disciplinary policies inconsistently as to Plaintiff compared with other employees who committed the same rule violations; he was provided with all the procedures to which he was entitled under his Union's Collective Bargaining Agreement, he was disciplined in a manner that is consistent with the progressive discipline scheme outlined in the IDPAP, and other employees were disciplined for the same types of conduct that were the basis for Plaintiff's disciplinary charges.   (*Id.* at 34-35.)   Defendant also argues that Plaintiff cannot create a genuine dispute of material fact merely by disagreeing with its conclusions regarding whether his various rule violations were substantiated.   (*Id.* at 35-36.)

Second, Defendant argues that Plaintiff also cannot show that the relevant individuals (who were either involved in Plaintiff's most relevant rule-violation charge or responsible for the ultimate decision to terminate Plaintiff's employment) knew of his alleged protected activity. (*Id.* at 36-37.)

Third, Defendant argues that Plaintiff's various asserted theories of retaliation are not

supported by the evidence.   (*Id.* at 37-38.)   Specifically, Defendant argues that, contrary to

Plaintiff's assertion that he was "birddogged" by his manager, Joshua Lynch, in retaliation for

reporting his injury, the evidence indisputably shows that such conduct was merely routine

operational testing that is required under federal law.   (*Id.* at 37.)   Defendant further argues that

Plaintiff's theory that managers are motivated to discourage and punish employees for reporting

injuries is baseless because there is no evidence to show that managers' performance ratings,

annual reviews, ability to be promoted, or compensation is affected by employee injury reports.

(*Id.* at 38.)

Fourth, Defendant argues that it is entitled to summary judgment on Plaintiff's Second

Claim also because, even if Plaintiff could establish a prima facie case of retaliation under the

FRSA, there is no genuine dispute of material fact as to whether Defendant would have

terminated Plaintiff's employment for a legitimate reason absent his injury report.   (*Id.* at

39-42.)   Specifically, Defendant argues that, by the time of his termination, Plaintiff had

received formal discipline for multiple safety rule violations in accordance with the progressive

discipline policy contained in the IDPAP; he had more than three non-major violations within a

three-year period and had also violated the same safety rule three times within that same period,

both of which conditions would allow for dismissal under the IDPAP.   (*Id.* at 39-41.)

Defendant further argues that Plaintiff was treated the same as similarly situated comparators

who had a similar amount and type of rule violations.   (*Id.* at 42.)

### 2.    Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendant's motion for summary judgment, Plaintiff asserts

three arguments.   (Dkt. No. 37.)   First, Plaintiff argues that there is at least a genuine dispute of

material fact regarding whether his injury report contributed to his termination.   (*Id.* at 20-26.)

Specifically, Plaintiff argues that a connection is established by the close temporal proximity

between his injury report and his termination, indications of pretext related to his final

disciplinary charge, evidence of disparate treatment between him and other employees who

engaged in similar rule violations but were not disciplined, and the fact that his last disciplinary

charge resulted in termination only because of the previously assessed rule violations, which had

resulted from Defendant's carefully watching him in order to find reasons to justify his

termination.   (*Id.* at 20-24.)   Plaintiff further argues that relevant decisionmakers related to his

eventual termination did or would have known of his injury report at the time they made the

decision to terminate his employment.   (*Id.* at 24-26.)

Second, Plaintiff argues that there is at least a genuine dispute of material fact regarding

whether Defendant would have terminated his employment absent his injury report.   (*Id.* at

26-28.)   Specifically, Plaintiff argues that the evidence shows he was the only employee

disciplined for most of the conduct with which he was charged, and that the employees with

which Defendant now attempts to compare him are not similarly situated because they were

charged with different conduct or rule infractions than was Plaintiff.   (*Id.*)

Third, Plaintiff argues that the Court should *sua sponte* grant him summary judgment on

the second claim he has asserted under the FRSA, which relates to his refusal to waive his right

to a hearing during the disciplinary process.   (*Id.* at 28-29.)

### 3.   Defendant's Reply Memorandum of Law

Generally, in its reply to Plaintiff's opposition, Defendant asserts six arguments.   (Dkt.

No. 40.)   First, Defendant argues that Plaintiff has not asserted any retaliation claim premised on

43

his refusal to waive his right to a hearing, either in his Complaint or at any time throughout the discovery process.   (*Id.* at 5.)

Second, Defendant argues that, related to Plaintiff's responses to its Statement of Material Facts, there is no basis to strike any evidence on the ground that it might not have been disclosed before the filing of the motion for summary judgment.   (*Id.* at 5-6.)

Third, Defendant argues that Plaintiff has not met his burden to show that his injury report was a contributing factor in his termination.   (*Id.* at 6-9.)   Specifically, Defendant argues that there is no temporal proximity between his injury report and the alleged retaliatory action, and he has not shown any plausible retaliatory motive that is supported by the evidence.   (*Id.*)

Fourth, Defendant argues that Plaintiff cannot rely on the disciplinary actions taken against him before the March 2019 violation that resulted in his termination because such events are time-barred pursuant to the 180-day commencement date dictated by the statute.   (*Id.* at 9.)

Fifth, Defendant argues that the Court should disregard the declarations of Mr. Villegas and Mr. Wehrlin when assessing whether a genuine dispute of material fact exists because those declarations offer nothing more than speculation or conjecture based on the declarant's belief or understanding rather than any personal knowledge.   (*Id.* at 9-11.)

Sixth, Defendant argues that it has demonstrated by clear and convincing evidence that it would have dismissed Plaintiff even if he had not reported an injury.   (*Id.* at 11-14.) Specifically, Defendant argues that the multiple rule violations warranted termination under the IDPAP, noting that it could in fact have terminated Plaintiff earlier under the IDPAP but instead chose to give him a suspension.   (*Id.*)   Defendant further argues that there is no evidence to support Plaintiff's assertions that the video related to the March 2019 operational test failure was

procured in any way other than through the random selection process Defendant uses, that Plaintiff was charged for certain conduct while other employees were not, or that the decision to terminate him was not consistent with how other similarly situated employees were treated. (*Id.*)

### D.      Parties' Arguments on Defendant's Motion to Exclude Expert Testimony

### 1.      Defendant's Memorandum of Law

Generally, in its motion to exclude the testimony of Plaintiff's expert George Gavalla, Defendant asserts five arguments.   (Dkt. No. 36, Attach. 4.)   First, Defendant argues that Mr. Gavalla's testimony is inadmissible under Fed. R. Evid. 702, because it does not assist the trier of fact, but instead is merely a summary of the facts in this case of which he has no personal knowledge, with opinions or conclusions that require no special expertise and which are the proper province of the jury or factfinder.   (*Id.* at 8-12.)

Second, Defendant argues that Mr. Gavalla's testimony summarizing and interpreting federal railroad safety regulations and rules is inadmissible, because factual narratives about the context and history of federal regulations can be presented and understood without expert testimony, and the application or interpretation of legal standards is not a permissible function of expert testimony.   (*Id.* at 12-16.)

Third, Defendant argues that Mr. Gavalla's opinions regarding whether Defendant violated the FRSA are inadmissible because they usurp the role of the factfinder.   (*Id.* at 17.)

Fourth, Defendant argues that Mr. Gavalla's opinions regarding whether Defendant's application of its disciplinary policies was or was not proper are inadmissible, because he conceded that he did not review the relevant versions of the IDPAP in formulating those

opinions.   (*Id.* at 17-18.)

Fifth, Defendant argues that many other statements in Mr. Gavalla's report are unhelpful or inadmissible, highlighting instances where Mr. Gavalla testified regarding railroads other than Defendant, made unsupported speculative statements, and attempted to speak for the Federal Railroad Administration despite having stopped working for that agency 18 years before.   (*Id.* at 19-20.)

### 2.    Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendant's motion to exclude the expert testimony, Plaintiff asserts six arguments.   (Dkt. No. 39.)   First, Plaintiff argues that he is not intending to offer any opinions by Mr. Gavalla regarding whether Defendant's actions were consistent with discriminatory practices or the applicable regulations, and therefore any arguments to exclude such testimony are moot.   (*Id.* at 1 n.1, 5.)   Plaintiff clarifies that Mr. Gavalla will testify about "the effect of suppression of injury reports on railroad safety and the means by which railroads have been known to suppress injury reports," which will include explanations of "the purpose of various FRA regulations related to injury reporting and myriad consequences to workers and the public when railroads flout those regulations," as well as about "whether [Plaintiff] violated the applicable safety regulations."   (*Id.* at 5.)

Second, Plaintiff argues that Mr. Gavalla is qualified to testify on these subjects based on his experience in the area of railroad safety.   (*Id.* at 5-7.)

Third, Plaintiff argues that Mr. Gavalla's testimony is relevant and will assist the jury. (*Id.* at 7-11.)   Specifically, Plaintiff argues that other courts have found similar expert testimony by Mr. Gavalla admissible in similar cases, and that his testimony regarding railroad safety

standards is relevant to the issue of pretext and will help the jury understand issues that are not common knowledge, including the financial incentives railroads have to discourage injury reports, the railroads' exemption from worker's compensation laws, and the use and prevalence of the practice of "birddogging" in the railroad industry.  (*Id.* at 7-10.)   Plaintiff also argues that Mr. Gavalla's testimony on railroad safety standards and their purpose is relevant to Plaintiff's claim for punitive damages, and that his testimony regarding whether Plaintiff violated the applicable safety regulations is relevant to the issue of retaliation.   (*Id.* at 10-11.)

Fourth, Plaintiff argues that Defendant's objections to Mr. Gavalla's testimony are premature, because it is not possible to determine at this time whether his testimony will in totality be inadmissible or unhelpful to a factfinder.   (*Id.* at 11.)

Fifth, Plaintiff argues that Mr. Gavalla's testimony and opinions in general are admissible and proper.  (*Id.* at 12-15.)   Specifically, Plaintiff argues that Mr. Gavalla will not merely provide a factual narrative but rather expert opinions based on the facts in evidence, and his opinions about the meaning and purpose of safety regulations as well as whether Plaintiff violated the relevant safety regulations are all admissible because he will not interpret the law for the jury nor merely offer conclusions regarding whether the regulations were violated, but instead provide information about the railroad industry that is not within the general knowledge of a typical juror.  (*Id.*)

Sixth, Plaintiff argues that Defendant's other objections are without merit because there is no indication that the rules in the FRA Guide have changed since the version Mr. Gavalla relied upon, and the fact that Mr. Gavalla may not have knowledge of some of Defendant's specific policies and rules is immaterial to whether he can provide testimony regarding the

railroad industry in general.   (*Id.* at 15-16.)

### 3. Defendant's Reply Memorandum of Law

Generally, in its reply to Plaintiff's opposition, Defendant asserts four arguments.   (Dkt. No. 41.)   First, Defendant reiterates that Plaintiff has conceded that any testimony as to whether Defendant violated the FRSA is not admissible.   (*Id.* at 5.)

Second, Defendant argues (a) that Mr. Gavalla cannot testify regarding any matters that were not addressed in his report, which includes the now-offered topic of whether Plaintiff violated the applicable CSXT safety regulations related to the incidents for which he was disciplined, and (b) that there is no indication that he would have any foundation to make such opinions even if they had been disclosed.   (*Id.* at 6.)

Third, Defendant argues that the proffered testimony in general does not require expert proof and is based on stale experience, because (a) it is mostly a recitation of a factual narrative, (b) Mr. Gavalla's experience in the field of railroad safety is outdated based on the fact that he last worked for the FRA in 2004, and (c) regardless of Plaintiff's characterizations, much of Mr. Gavalla's prospective testimony will be offering interpretations of legal standards or offering legal conclusions.   (*Id.* at 7-10.)

Fourth, Defendant argues that Mr. Gavalla's testimony is not relevant to the issue of punitive damages because his report indicates he will address only generic industry-wide practice rather than any conduct specifically by Defendant either in general or in this specific case.   (*Id.* at 10-11.)

## II. GOVERNING LEGAL STANDARDS

### A. Procedural Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."   Fed. R. Civ. P. 56(a).   A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[97]   As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted."   *Anderson*, 477 U.S. at 248. In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant.   *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact."   *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).   However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial.   Fed. R. Civ. P. 56(a), (c), (e).[98]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to

---

[97]    As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."   *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].   As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts."   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

[98]    Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.   N.D.N.Y. L. R. 7.1(a)(3).

perform an independent review of the record to find proof of a factual dispute.

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3).   What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.[99]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(a)(3).[100]   Stated another way, when a non-movant fails to oppose a legal argument

---

[99]    Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.   N.D.N.Y. L. R. 56.1(b).

[100]    *See*, *e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming

asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

### B.    Substantive Standard Governing a FRSA Retaliation Claim

To make out a prima facie case of retaliation under the FRSA, a plaintiff must establish by a preponderance of the evidence the following four elements: "(1) the plaintiff engaged in protected activity; (2) the employer knew that the plaintiff engaged in the protected activity; (3) the plaintiff suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Tompkins v. Metro-North Commuter R.R. Co.*, 983 F.3d 74, 80 (2d Cir. 2020) (quoting *Bechtel v. Admin. Rev. Bd.*, 710 F.3d 443, 447 [2d Cir. 2013]) (alterations omitted).

"If the plaintiff satisfies all of these [four elements], then the burden shifts to the employer to demonstrate by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity." *Niedziejko v. Delaware & Hudson Ry. Co., Inc.*, 18-CV-0675, 2019 WL 1386047, at *36 (N.D.N.Y. Mar. 27, 2019) (Suddaby, C.J.) (internal quotation marks omitted).

### III.    ANALYSIS

### A.    Whether the Court Should Grant Defendant's Motion for Summary

plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

**Judgment**

After careful consideration, the Court answers this question in the negative for the following reasons.

As an initial matter, the Court agrees with Defendant that Plaintiff has not properly asserted any claim regarding retaliation on the basis of his refusal to waive his right to a hearing. (Dkt. No. 37, at 28-29.)   Plaintiff makes no mention of his waiver of his right to a hearing in the Complaint, much less any indication that he intended to assert that Defendant retaliated against him for such waiver.   (Dkt. No. 1.)   The only basis for retaliation that can be reasonably inferred from the Complaint relates to his injury report, and therefore that is the only basis on which Plaintiff can seek recovery.   *Cf. Quinones v. City of Binghamton*, 997 F.3d 461, 468-69 (2d Cir. 2021) (finding the plaintiff had sufficiently stated a claim for discrimination in the complaint despite failing to enumerate that as a separate cause of action because the complaint "sufficiently informed Defendants of the factual basis for" such claim) (quoting *Johnson v. City of Shelby*, 574 U.S. 10, 12 [2014]) (internal quotation marks omitted).

In this case, there does not appear to be any dispute regarding whether Plaintiff's report of his injury constituted a protected activity, or that Plaintiff suffered an unfavorable personnel action in the form of his termination in April 2019.   Rather, there are disputes regarding whether Defendant had proper knowledge of Plaintiff's protected activity, and whether his injury report was a contributing factor in his termination.

Further, although there is no dispute that Plaintiff suffered an unfavorable action, it is important to clarify precisely what constitutes the unfavorable action in this matter.   As Defendant has highlighted in its memoranda, the sole instance of discipline Plaintiff received

52

after his injury report in August 2018 that falls within the relevant 180-day period (before he filed his complaint with OSHA) is related to the final violation from March 2019, for which he was dismissed on April 26, 2019. *See* 49 U.S.C. § 20109(d)(2)(A)(ii) (indicating that an action shall be commenced not later than 180 days after the date on which the alleged violation occurs). As a result, Plaintiff's termination is the only disciplinary action taken against him that can constitute an adverse action, although his other instances of discipline may still be considered as background evidence when assessing the overall context of the case. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105, 112-13 (2002) (holding that Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period"); *Dunn v. BNSF Railway Co.*, 17-CV-0333, 2017 WL 3670559, at *8 (W.D. Wa. Aug. 25, 2017) (applying the holding from *Morgan* to the FRSA); *see also Roop v. Kansas City Southern Railway Co.*, 16-CV-0413, 2017 WL 4844832, at *1 (E.D. Ok. Oct. 26, 2017) ("Although recovery for any action outside the 180-day period is barred, an employee may still use the prior acts as background evidence in support of a timely claim.") (internal quotation marks omitted).

### 1. Whether Defendant Had Knowledge of Plaintiff's Injury Report

After careful consideration, the Court finds that a genuine dispute of material fact exists as to whether this element can be proven, and therefore summary judgment is not appropriate as related to this factor.

To meet the requirements of this element of a prima facie case of retaliation under FRSA, "[a]t least one person involved in the adverse employment decision must have knowledge of the protected activity, even if it is an advisor or [member of] upper management." *Niedziejko*, 2019 WL 1386047, at *41 (quoting *Conrad v. CSX Transp., Inc.*, 13-CV-3730, 2014 WL 7184747, at

*4 [D. Md. Dec. 15, 2014]).   Further, "[t]he plaintiff 'need not prove that the decision-maker responsible for the adverse action knew of the protected activity if it can be established that those advising the decision-maker knew, regardless of their motives.'"   *Niedziejko*, 2019 WL 1386047, at *41 (quoting *Rudolph v. Nat'l R.R. Passenger Corp.*, ARB Case No. 11-037, 2013 WL 1385560, at *12 [Dep't of Labor Mar. 29, 2013]).   Indeed, courts have applied such a "cat's paw theory" in circumstances where a supervisor who advised the ultimate decisionmaker or was otherwise intimately involved in the decision was aware of the protected activity.   *Niedziejko*, 2019 WL 1386047, at *41-42 (collecting cases).

The Court notes again that, because the unfavorable action that is the subject of the retaliation claim here is Plaintiff's termination as a result of the March 2019 rules violation, it is that decision which is important to this portion of the analysis.   The parties dispute a number of key facts related to this element, including whether Mr. Garofolo was the ultimate decision-maker relating to Plaintiff's termination (as opposed to the manager charging Plaintiff with the relevant rules violation or Mr. Lynch, who acted as the hearing officer for the relevant charge) and whether he had knowledge of Plaintiff's injury at the time he adopted Labor Relations' recommendation to terminate Plaintiff.

As to the first of these issues, there is no genuine dispute that Mr. Garofolo was the ultimate decision-maker regarding Plaintiff's termination.   The undisputed evidence shows that he adopted the recommendation of Labor Relations after he reviewed the transcript from Plaintiff's hearing on the matter, and that it was his name that was on the termination letter following his adoption of the recommendation.   (Dkt. No. 35, Attach. 11, at 17-18; Dkt. No. 35, Attach. 28.)   Nor does there appear to be any dispute that Mr. Garofolo had the ultimate

54

discretion to either accept or reject the recommendation provided to him by Labor Relations following the hearing.   (Dkt. No. 35, Attach. 11, at 19-20; Dkt. No. 35, Attach. 27, at 2.)

Plaintiff attempts to argue that other individuals, particularly the individual or individuals who originally decided to charge him with a rule violation, are in effect the decision-makers, because the hearing and appeals process are merely sham proceedings that "rubber-stamp" the charging decision, but such arguments are not supported by any evidence.   Plaintiff has relied for this point primarily on the declaration of Jack Gross, a Local Chairman of Plaintiff's union. (Dkt. No. 37, Attach. 17.)   Mr. Gross stated in his declaration that the disciplinary hearings held pursuant to the Collective Bargaining Agreement "are nothing but a kangaroo court," noting that charges "are rarely or ever dismissed for substantive reasons," and representing that, despite having represented hundreds of employees in hearings, he could recall only two instances where the transcript of the hearing was forwarded for review and the review resulted in the employee's exoneration.   (Dkt. No. 37, Attach. 17, at ¶ 4.)   However, Mr. Gross' anecdotal evidence, which admits that in some cases the charges have been dismissed, is insufficient to create a genuine dispute of material fact that Mr. Garofolo merely rubberstamps the decisions of the charging supervisor or the hearing officers in all cases in light of his testimony that he did in fact review the hearing transcript in this specific instance, and that he has disagreed with recommendations in the past.[101]   (Dkt. No. 35, Attach. 11, at 17-20.)   The question is therefore whether Mr. Garofolo knew of Plaintiff's injury report.

There is sufficient evidence presented with this motion, when drawing all reasonable

---

[101]    Also notable is Mr. Lynch's testimony that, in the 25 or 50 hearings at which he had acted as the hearing officer, he recalled having found that the employee should be exonerated of the charges on substantive grounds at least once or twice, but possible more.   (Dkt. No. 35, Attach. 7 at 49.)

inferences in favor of Plaintiff as the non-moving party, to raise a genuine dispute of material

fact as to whether Mr. Garofolo was aware of Plaintiff's injury before Plaintiff was terminated.

Mr. Villegas, Plaintiff's manager on the date of his injury and the individual to whom he

reported that injury, stated in a declaration that, upon being informed of Plaintiff's injury, he

reported it to his own supervisor, Brian Murray, and that as part of the investigation into that

injury, he brought Plaintiff to be questioned at a meeting with both Mr. Murray and Mr.

Garofolo.   (Dkt. No. 37, Attach. 5; Dkt. No. 37, Attach. 11.)   At his deposition, Mr. Garofolo

testified that he could not recall if he had ever met or spoken with Plaintiff and that he had no

independent recollection as to whether he was specifically made aware of Plaintiff's injury, but

he acknowledged that, as superintendent, he was generally notified of any injuries by the

trainmaster, would have been kept updated throughout the investigation of any injuries, and

would have received the report after an injury was investigated, stating broadly that "[w]e were

aware of all injuries" and "I knew all of them."   (Dkt. No. 35, Attach. 11, at 11-13.)   This

evidence could sufficiently allow a reasonable factfinder to conclude that Mr. Garofolo would

have had the requisite knowledge of Plaintiff's injury report before the time he made the decision

to terminate Plaintiff's employment.[102]

For these reasons, there is at the very least a genuine dispute of material fact as to

whether Mr. Garofolo had the requisite knowledge of Plaintiff's injury report.[103]

---

[102]     The Court notes that there appears to be no clear evidence as to what individuals were
part of the Labor Relations group that recommended termination following the hearing.

[103]     It is not clear that Mr. Lynch's knowledge of Plaintiff's injury report (which could
reasonably be said to have existed at least by late December 2018 based on the evidence) would
be considered legally sufficient to impute knowledge to Mr. Garofolo under a cat's paw theory.
(Dkt. No. 35, Attach. 17, at 26; Dkt. No. 35, Attach. 24, at 20-21.)   Although Mr. Lynch
undisputedly made findings that the March 2019 charges against Plaintiff were proven, and thus
essentially recommended that some sort of discipline be imposed on Plaintiff by the natural

## 2.    Whether Plaintiff's Injury Report was a Contributing Factor

After careful consideration, the Court finds that there exists a genuine dispute of material fact as to whether this element can be proven, and therefore summary judgment is not appropriate as related to this factor.

"To establish that retaliation was a contributing factor, [a] FRSA plaintiff must produce evidence of 'intentional retaliation prompted by the employee engaging in protected activity.'" *Tompkins v. Metro-North Commuter R.R. Co.*, 983 F.3d 74, 82 (2d Cir. Dec. 17, 2020). Although "[t]he plaintiff need not show that the 'contributing factor' was the sole factor affecting the discipline or that the employer acted only with retaliatory motive," he or she "must . . . show 'more than a temporal connection between the protected conduct and the adverse employment action . . . to present a genuine factual issue on retaliation.'"   *Tompkins*, 983 F.3d at 82.   In making this determination, the court must consider the following factors: "(1) whether and to what extent the disciplinary measures were related to the protected activity, (2) the temporal relationship between the protected activity and the disciplinary measures, including whether any intervening incidents occurred that could independently justify the discipline, (3) whether the disciplined employee was represented by counsel or a similar representative in the disciplinary proceedings, and whether the disciplinary measures were upheld on appeal, (4) whether, if applicable, the disciplinary measures were upheld following Department of Labor proceedings, and (5) whether the persons accused of hostility towards the employee's protected activity participated in the disciplinary decision."   *Tompkins*, 983 F.3d at 82-83.   "The Court must evaluate evidence of the employer's nonretaliatory reasons for the adverse employment action

---

consequence of such a finding, there does not appear to be any evidence showing that he specifically made any recommendation, either to Labor Relations or to Mr. Gorofolo, that Plaintiff's employment be terminated.

57

when considering this element." *Necci v. Long Island R.R. Co.*, 16-CV-3250, 2019 WL

1298523, at *9 (E.D.N.Y. Mar. 21, 2019) (citing *Tompkins v. Metro-North Commuter R.R.*,

16-CV-9920, 2018 WL 4573008 [S.D.N.Y. Sept. 24, 2018], *aff'd* 983 F.3d 74).

####       a.       Relatedness With the Protected Activity

As to the first factor, the disciplinary measure relevant in this instance, i.e., Plaintiff's

termination, was based on a rule violation charge that facially had nothing to do with his injury.

However, in assessing the relatedness of the original injury report with the ultimate decision to

terminate him, it cannot be ignored that Plaintiff has asserted that the multiple rule violations

with which he was charged following his injury report are part of a pattern of retaliatory action

intended to provide a pretextual justification for his termination.   A discussion of those incidents

and proceedings is therefore appropriate as part of the assessment of whether the decision to

ultimately terminate his employment was related to his injury.   In doing so, the Court will

constrain its focus to the violation related to Plaintiff's injury in August 2018 and the violations

that occurred on December 2018, January 2019, and March 2019, as those are the violations that

were brought within the IDPAP progressive discipline policy upon which Defendant relies as its

justification for terminating Plaintiff's employment.   The Court reemphasizes, however, that

Plaintiff cannot succeed on his retaliation claim merely by showing that any of the August 2018,

December 2018, or January 2019 incidents alone raise an inference of retaliatory intent because

those instances of discipline are time-barred as discrete adverse actions.   Yet, as was discussed

above, such incidents may still properly be considered as background evidence in support of his

claim based on his timely asserted adverse action, i.e., his termination.   *See Mercier v. United*

*States Dept. of Labor, Admin. Review Bd.*, 850 F.3d 382, 388-89 (8th Cir. 2017) (finding the ALJ

properly considered as background evidence an adverse employment action that was time-barred because such evidence was relevant to the plaintiff's timely adverse action in that it "'provides a complete picture of the relationship between Mercier and UP and whether Mercier was discriminated against because of his protected activities") (citing *Morgan*, 536 U.S. at 113); *Dunn*, 2017 WL 3670559, at *8; *Roop*, 2017 WL 4844832, at *1.   The purpose of analyzing these earlier incidents is to assess whether they can reasonably be construed as evidence of a retaliatory thread linking Plaintiff's injury report with his ultimate termination.

### i.       August 2018 Handbrake Charge

As to the handbrake charge, the undisputed facts are that Plaintiff sustained an injury to his left shoulder on August 2, 2018, while applying a handbrake, and that he reported that injury to the manager on duty, Josh Villegas.   (Dkt. No. 35, Attach. 12, at 6.)   On August 21, 2018, Defendant held a hearing, at which Nick Wehrlin acted as the hearing officer and Plaintiff was represented by union representative Jack Gross.   (Dkt. No. 35, Attach. 12.)   Plaintiff was charged with failing to properly position his body while operating a vertical wheel handbrake, and in particular with using the incorrect hand to do so.   (Dkt. No. 35, Attach. 12, at 3, 6, 8-9.) At this hearing, Mr. Villegas testified regarding the events of that day, including that Plaintiff had admitted, in response to questioning, that he understood that the way he had operated the handbrake was not compliant with the rules and that he would make sure to comply with the rules going forward.   (Dkt. No. 35, Attach. 12, at 7, 11.)   Mr. Villegas further testified that the initial investigation was regarding only the injury itself, and it was during the investigation into the injury that the rule violation was discovered.   (Dkt. No. 35, Attach. 12, at 13.)   Plaintiff himself testified that he did not recall which hand he had used to throw the handbrake on that day

or what he had said to Mr. Villegas or Mr. Murray that day.   (Dkt. No. 35, Attach. 12, at 23-24, 26.)   In a letter dated September 17, 2018, bearing Mr. Garofolo's signature, Plaintiff was notified that he had been found to have violated the relevant safety rules and been assessed a 15-day actual suspension.   It is notably undisputed that Mr. Lynch was not on duty the day Plaintiff was injured, nor did he have any role or input into the decision to charge Plaintiff with a violation or to find him guilty of such violation.

Plaintiff nonetheless argues that retaliation is obvious as to this charge in particular because he would not have been charged with any violation had he not reported his injury, citing various statements by CSXT personnel, namely Mr. Villegas[104] and Mr. Wehrlin.[105]   (Dkt. No. 37, Attach. 10; Dkt. No. 37, Attach. 11.)   As an initial matter, while it is true that Defendant would likely have never learned that Plaintiff had violated any rules had he not been injured in the process of doing so, Plaintiff's argument fails to acknowledge the important distinction between punishing an employee for reporting an injury (which is not permissible) and punishing an employee for violating safety rules (which is permissible); the fact that the injury occurred

---

[104]   Mr. Villegas stated in his declaration that "I don't believe Stever would have been disciplined for the incident that resulted in his injury absent his injury/report of that injury because it more than likely would have gone unobserved.   It is CSX's policy to investigate every injury and charge the injured employee with any rule violation that is discovered."   (Dkt. No. 37, Attach. 11, at ¶ 3.)   After stating that his supervisors decided to charge Plaintiff with the rule violations after an investigation into his injury, Mr. Villegas continued, "Had I seen Stever engaged in the same conduct absent an injury, I would have elected to coach and counsel him about the importance of using proper body mechanics when operating a vertical wheel handbrake."   (*Id.*)

[105]   In his declaration, Mr. Wehrlin stated in relevant part, that in the hearing over which he presided, the supposed rule violations "came to CSX's attention because Stever suffered a workplace injury while operating the handbrake.   In my experience, neither would the violation have come to CSX's attention absent Stever reporting an injury nor would CSX have disciplined Stever for using poor body mechanics even had the conduct come to its attention absent his injury."   (Dkt. No. 37, Attach. 10.)

while the employee was violating safety rules does not inherently shield the employee from discipline for violating those rules.   Likewise, the fact that Defendant likely would never have learned of the rule violation in the absence of plaintiff's injury report does not preclude it from addressing such violation when it has learned of them.   Indeed, other courts have expressly rejected this type of argument.   *See, e.g., BNSF Railway Co. v. U.S. Dep't of Labor Admin. Review Bd.*, 867 F.3d 942, 046-47 (8th Cir. 2017); *Boatright v. CSX Transp., Inc.*, 21-CV-0028, 2023 WL 4548280, at *10 (S.D. Ga. July 14, 2023).   The more pertinent question is whether Plaintiff would have been assessed with charges for those rule violations had they been observed in a circumstance where he had not suffered an injury; the declaration of Mr. Wehrlin in particular (which he bases on his personal experience) seems to suggest not.[106]   (Dkt. No. 37, Attach. 10.)   Mr. Wehrlin's evidence could permit a reasonable factfinder to conclude that there was some element of retaliatory motivation in Defendant's choice to formally discipline Plaintiff for this conduct.   However, even if a reasonable inference of retaliation can be drawn as to the charges stemming from this incident, whether the discipline Plaintiff received for this specific charge was indeed in retaliation for his injury report is not the end of the analysis, because any claim of retaliation as to this charge as a discrete adverse action is, as already discussed,

---

[106]     Defendant argues that the Court should find Mr. Wehrlin's declaration to be inadmissible because it contains "nothing more than impermissible speculation and conjecture."   (Dkt. No. 40, at 9-10.)   Notably, however, Defendant does not specifically identify any fault with the particular statement relied upon here, which is not based on Mr. Wehrlin's mere "belief" or "understanding," but explicitly upon his "experience."   Because Mr. Wehrlin has both personal knowledge of the specifics of Plaintiff's charge and, to some extent, Defendant's history of applying its own rules and disciplinary procedures, there is no basis at this time for finding at least this part of his declaration to be inadmissible.   *See New Hope Family Servs., Inc. v. Poole*, 626 F. Supp. 3d 575, 581 (N.D.N.Y. 2022) (D'Agostino, J.) ("Where a party relies on affidavits . . . to establish facts, the statements must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated.") (quoting *DiStiso v. Cook*, 691 F.3d 226, 230 [2d Cir. 2012]) (internal quotation marks omitted).

time-barred.   It is, however, relevant to the analysis of whether retaliatory intent existed (and thus whether Plaintiff's protected activity was a contributory factor in Defendant's choice to terminate his employment), but only to the extent that such retaliatory intent continued to exist related to the other charges and discipline that followed, up through Plaintiff's termination.

### ii.   December 2018 Footwear Charge

As to the charge related to Plaintiff's boot lacking a defined heel, the undisputed facts are that, at some point on December 24, 2018, in the context of Plaintiff and Mr. Lynch discussing non-skid winter footwear for use in the yard, Mr. Lynch concluded, based on his observations, that the work boots Plaintiff was wearing did not have a defined heel as required by Defendant's safety rules.   (Dkt. No. 35, Attach. 7, at 27-30.)   Plaintiff went to get another pair of boots from his car, and Mr. Lynch deemed those boots also noncompliant with the rules and sent Plaintiff off the job site because he did not have complaint footwear.   (Dkt. No. 35, Attach. 2, at 79-81; Dkt. No. 35, Attach. 7, at 29-30; Dkt. No. 35, Attach. 17, at 8-10.)   A hearing was held on December 31, 2018, at which Nick Wehrlin again acted as the hearing officer and Plaintiff was represented by union representative Stephen Ruffalo.   (Dkt. No. 35, Attach. 17.)   Plaintiff was charged with wearing boots lacking a defined heel.   (Dkt. No. 35, Attach. 17, at 3, 6.)   The rule in question, as read at the hearing, requires that boots worn while working outside an office environment must have, in relevant part, a "[d]efined heel not more than one inch high."   (Dkt. No. 35, Attach. 17, at 7.)   The term "defined heel" is not otherwise defined in the rule.   At the hearing, Mr. Lynch testified that the purpose of the defined heel requirement is "so that when an employee is riding a car, his feet stayed tucked in the stirrup and it prevents it from slipping." (Dkt. No. 35, Attach. 17, at 13; Dkt. No. 35, Attach. 2, at 80.)   Pictures were also submitted as

evidence at that hearing, of both Plaintiff's own boots and examples of compliant boots with a defined heel.   (Dkt. No. 35, Attach. 17, at 34-37, 40-42.)   In a letter dated January 25, 2019, bearing Mr. Garofolo's signature, Plaintiff was notified that he had been found to have violated the relevant safety rule and was assessed with a three-day actual suspension.   (Dkt. No. 35, Attach. 19.)   Mr. Lynch later stated in his deposition that, although he turned in an observation and assessment regarding this incident, it was Field Administration that made the decision to issue a charge letter regarding the incident as opposed to requiring mere coaching or counseling. (Dkt. No. 35, Attach. 7, at 34-35.)

Plaintiff has essentially argued that a retaliatory inference should be drawn from the fact that Mr. Lynch charged Plaintiff with this violation, relying essentially on the argument that Plaintiff's boots did indeed have a defined heel and therefore did not violate the charged rule. He further argues that the retaliatory intent is clear from the fact that he had been wearing those same boots to work before this incident without ever having any disciplinary charges and that no one else at CSXT has ever been disciplined for boots lacking a defined heel.   As to Plaintiff's assertion that no other employee at CSXT has *ever* been disciplined related to non-compliance with the defined heel rule, the evidence Plaintiff cites does not support that statement.[107]   That

---

[107]     Notably, he cites to the deposition testimony of Bryan Murray, in which Mr. Murray stated merely that he did not recall if any other employee has ever been disciplined for that particular violation.   (Dkt. No. 35, Attach. 8, at 19.)   However, Mr. Murray's lack of memory of such fact does not constitute evidence that it never happened: indeed, it expressly disclaims the sort of personal knowledge required by Fed. R. Evid. 602.   *See, supra,* Note 33 of this Decision and Order.   He also cites Mr. Lynch's deposition testimony, in which Mr. Lynch testified that he was sure he has seen other people wearing boots without a defined heel since the incident with Plaintiff, but he did not know "off the top of his head," and he later testified that he was "sure" he had entered an operational test failure or assessment for other employees who were wearing boots without a defined heel, but he could not think of any specific instances at that time, nor could he identify "off the cuff" anyone else who had been disciplined for such violation.   (Dkt. No. 35, Attach. 7, at 32.)   Again, this testimony does not constitute evidence supporting the conclusion that no other employee had ever been disciplined for this type of

being said, the only evidence supporting the fact that such violations had been assessed against

other employees was the (vague) testimony by Mr. Lynch that he had turned in operational test

failures against others for the same violation, but he was unable to recall who those employees

were or how many times it had occurred.   (Dkt. No. 35, Attach. 7, at 32.)   There is notably no

evidence indicating whether any of those other employees faced formal disciplinary charges for

any such operational test failures in the same manner that Plaintiff did, as opposed to facing a

more informal course of correction such as an ICI or counseling.   Nor is there any evidence to

counter Plaintiff's undisputed assertion that he had been wearing the same boots without issue

before his injury.   Although it is certainly possible that a manager simply had not noticed the

state of his boots before that time, drawing all reasonable inferences in favor of Plaintiff as the

non-moving party, this fact, when considered in context, can reasonably be construed as

evidence raising an inference of retaliatory intent.   Further, in the comparator evidence

Defendant submitted with its motion, there appears to be only one other employee in that set of

individuals who was assessed with a comparable rule violation related to safe footwear; that

employee notably received an ICI for failing to wear anti-slip footwear on or around tracks, an

offense that is similar, although not identical to, Plaintiff's failure to wear boots with a defined

heel, for which he was assessed with a "Serious 2" level offense.[108]   (Dkt. No. 35, Attach. 33, at

---

violation (although the reverse is also true that Defendant has not provided any concrete
evidence to show that it has disciplined other employees for wearing boots that lack a defined
heel).

[108]      It is not wholly clear from the briefing whether the number appended to the "Serious"
marker for charges is meant to reflect the level of seriousness (on an apparent scale of one
through three) or merely whether it is the first, second, or third violation within the three-year
period.   Plaintiff's charges were issued in numerical order (i.e., his August 2018 charge was
"Serious 1," his December 2018 charge was "Serious 2," his January 2019 charge was "Serious
3," and his March 2019 charge was also "Serious 3."   The comparator evidence also generally
suggests that the numbers correspond to sequence as opposed to severity.   (Dkt. No. 35, Attach.

85.)

As to Plaintiff's overall theory that Mr. Lynch specifically harbored retaliatory intent, although Mr. Lynch undisputedly was the person who entered the operational test failure in this instance, Mr. Lynch testified that it was the decision of Field Administration, rather than him, to initiate formal disciplinary proceedings related to the operational test failure.   However, an email between Mr. Lynch and Toni Eady, the manager of Field Administration, dated December 24, 2018, documents that Field Administration asked Mr. Lynch whether he was "good with this staying a minor or do you want to increase to a Non Major?"   (Dkt. No. 37, Attach. 13.)   Mr. Lynch responded, "Non-Major please."   (*Id.*)   The charge letter for this incident is dated December 26, 2018, after this email conversation occurred.   (Dkt. No. 35, Attach. 16, at 2.)   As such, this email directly contradicts Mr. Lynch's testimony that he had no involvement in the decision to charge Plaintiff with a formal disciplinary violation related to the operational test failure.   Under all of the above circumstances, there is at least a genuine dispute of material fact such that a reasonable factfinder could conclude that Mr. Lynch's actions in assessing an operational test failure against Plaintiff on this occasion constitute evidence of ongoing retaliatory intent.[109]

---

33.)

[109]   The Court notes that, as was discussed previously when assessing whether Mr. Lynch had knowledge of Plaintiff's injury report, there is no evidence definitively establishing whether or not Mr. Lynch was aware of Plaintiff's injury report at the time he entered the operational test failure for Plaintiff's boots.   An email dated December 5, 2018, between Mr. Lynch and Mr. Villegas discusses the fact that Plaintiff was out of work at the time and still needed to complete a 15-day suspension (which he received for the handbrake incident), although it does not specifically mention his injury report.   (Dkt. No. 37, Attach. 12.)   There is therefore at least a genuine question as to whether Mr. Lynch was aware of Plaintiff's injury report before December 24, 2018.   This evidence also supports Plaintiff's assertion that the December 24, 2018, incident occurred within days after he had returned to work following recovery from his injury and completion of his previously imposed 15-day suspension.

### iii.   January 2019 Shove Movement Charge

As to the charge related to Plaintiff's supervising of the shove movement on January 1, 2019, Mr. Lynch testified that he observed that Plaintiff, while engaged in protecting a shove movement, was having a conversation with another employee and also that he turned his back on the locomotive he was supposed to be watching to block the wind so that he could light a cigarette.   (Dkt. No. 35, Attach. 7, at 72-77; Dkt. No. 35, Attach. 9, at 7-8.)   A hearing was held on January 9, 2019, at which Mike Lewandowski acted as the hearing officer and Plaintiff was represented by union Local Chairman Jack Gross and union representative Stephen Ruffalo. (Dkt. No. 35, Attach. 9.)   Plaintiff was charged with engaging in unrelated tasks while involved in a shoving movement.   (Dkt. No. 35, Attach. 9, at 3.)   At that hearing, Mr. Lynch testified that, on the day in question, he observed Plaintiff having a conversation with a utility employee (which he later found out regarded whether Plaintiff was going to ride the cars to the other end of the track) while engaging in a shove movement; at the same time he was having that conversation, Mr. Lynch observed that Plaintiff, in order to light a cigarette, turned his back to the shove.   (Dkt. No. 35, Attach. 9, at 7-8.)   Mr. Lynch further testified that the employee to whom Plaintiff had been talking confirmed to him that Plaintiff had indeed engaged in unrelated tasks while involved in a shove movement (although Plaintiff continues to contend that he never admitted to doing anything wrong at that time).   (Dkt. No. 35, Attach. 9, at 9, 57.)   A recording of a radio conversation between Mr. Lynch and Plaintiff regarding Mr. Lynch's observations was played and read into the record at the hearing.   (Dkt. No. 35, Attach. 9, at 13-15, 19-20, 22-23.) Mr. Lynch also testified that Plaintiff "told me that he was wrong by lighting the cigarette and talking to the utility employee while he was engaged in a shove movement."   (Dkt. No. 35,

Attach. 9, at 28-29.)   In a letter dated February 8, 2019, bearing Mr. Garofolo's signature, Plaintiff was notified that he had been found to have violated the relevant safety rule and been assessed a five-day actual suspension.

Once again, the observation of an apparent rule violation was made by Mr. Lynch, and this occurred approximately a week after the observed violation related to Plaintiff's boots, and the day immediately following Plaintiff's hearing on that previous violation.   There is conflicting evidence regarding the extent of the activities in which Plaintiff was engaged at the time of the shove movement.   Plaintiff admitted during his deposition that he was lighting a cigarette and talking to a member of his crew at the time of the shove, but he testified that he did not believe that these were unrelated tasks and he could not recall whether he had turned his back to the shove for the purposes of speaking with that crew member.   (Dkt. No. 35, Attach. 2, at 88-89.)   At the hearing, Plaintiff admitted that he was lighting a cigarette during the shove, but he did not think that lighting a cigarette was an unrelated task.   (Dkt. No. 35, Attach. 9, at 55-56.)   He testified that the other employee, who was the utility man on the crew, had asked him if he was going to "ride the cars into 25 to make the hook," to which Plaintiff had responded, "No"; the utility man had then asked a follow up question, to which Plaintiff had also answered no.   (*Id.* at 56-57, 59.)   Plaintiff testified that he had maintained visual contact with the equipment and maintained contact with the Engineer through this encounter.   (*Id.*)   Plaintiff testified also that this short conversation was in compliance with another rule that requires communication to be maintained between the train crew and a utility employee regarding any information as to how duties will be performed and whether those duties will cause any crewmember to go on, under, or between rolling equipment, and that it did not compromise his

ability to control or stop the shove.   (*Id.* at 60.)   He again stated later in the hearing that he did

not lose visual contact with the engineer or take his eyes off the shove at any time during the

movement.   (*Id.* at 58, 63-64.)

Whether or not Defendant may have had reasonable grounds for both charging Plaintiff

with a rule violation and finding such violation to be proven after a hearing, the circumstances

presented, especially the factual questions related to what Plaintiff's exact conduct was at the

time of the shove movement, could permit a reasonable factfinder to conclude that this charge is

evidence of ongoing retaliatory intent.   This incident occurred in close proximity to the previous

operational test failure assessed by Mr. Lynch, and, again, not long after Plaintiff returned to

work following his injury and previous suspension.   There is also the fact that Mr. Lynch was

once again the person who observed the rule violation.   The transcript from the hearing on this

charge also makes clear that the rule that served as the basis for this violation is one that is fairly

ambiguous and open to various reasonable interpretations in that the term "unrelated task" is not

defined in Defendant's rules.

The comparator evidence provided by Defendant does show that multiple other

employees have been assessed with violations related to either failing to maintain visual contact

with the train while performing a shove movement or engaging in an unrelated task during a

shove movement.   However, one of these employees was assessed with a "Serious 1" violation

only after first being counseled for failing to maintain visual contact during the shove movement

but then committing another violation on his next shove movement the same day.   (Dkt. No. 35,

Attach. 33, at 80.)   Plaintiff was not similarly afforded an opportunity to correct his mistakes

before being charged with a disciplinary violation.   Two other employees did receive formal

charges related to a shove movement: one was assessed with a "Serious 3" offense for failing to maintain visual contact with the train while performing a shove movement, while another was assessed with a "Serious 1" offense for engaging in unrelated tasks during a shove movement. (Dkt. No. 35, Attach. 33, at 26, 40.)   The first of these is not comparable to Plaintiff because Plaintiff was not charged with failing to maintain visual contact during the shove movement, despite Mr. Lynch's assertion that Plaintiff had turned his back on the locomotive while lighting his cigarette; as discussed above, Plaintiff notably testified that he never lost visual contact with the train.   (Dkt. No. 35, Attach. 2, at 58, 63-64.)   As to the second employee, there is no indication in the evidence provided regarding what unrelated tasks that employee had been engaged in, and thus no way to determine whether the employee's conduct was comparable.   As was already discussed, there is a dispute between the parties as to whether the conduct Plaintiff was engaged in was an unrelated task within the meaning of the rule, as well whether that conduct represented a risk of compromising the safety of the shove movement that would warrant the imposition of formal disciplinary measures.   Although it is certainly within Defendant's discretion to determine when and to what extent to discipline its employees for violations of its rules, it may not do so if part of the basis for doing so the intent to retaliate against an employee for protected conduct, and the circumstances here, in conjunction with previously discussed evidence related to Mr. Lynch's recent involvement with Plaintiff, could permit a reasonable factfinder to conclude that the operational test failure assessment and resulting formal charge were based at least in part on impermissible retaliatory intent.

### iv.   **March 2019 Smoking and Eyewear Charge**

As to the charge related to the video of Plaintiff allegedly smoking and failing to wear

side shields on his glasses, the undisputed facts show that an inward-facing video camera captured footage of Plaintiff that was interpreted by Defendant as showing him both smoking in the cab of a locomotive and failing to wear side shields while the train was in motion and the window was open.   (Dkt. No. 35, Attach. 24, at 3; Dkt. No. 35, Attach. 22, at 14.)   A hearing was held on March 28, 2019, at which Mr. Lynch acted as the hearing officer and Plaintiff was represented by union Local Chairman Stephen Ruffalo.   (Dkt. No. 35, Attach. 24.)   Plaintiff was charged with smoking in the cab of a locomotive and failing to wear required side shields on his glasses.   (Dkt. No. 35, Attach. 24, at 3.)   At the hearing, screenshots of a video were submitted in which an individual identified as Plaintiff appears to be smoking while inside the cab of the locomotive and also to not be wearing side shields despite an open window.   (Dkt. No. 35, Attach. 24, at 8-10.)   It was also adduced at the hearing that Taylor James from Defendant's Safety Department had sent the pictures to Mr. Villegas for him to review after Mr. James had determined the video appeared to show Plaintiff committing rule violations, and that Mr. James had obtained that video through the random selection process used for the purpose of operational testing by the Safety Department.   (Dkt. No. 35, Attach. 24, at 15-16, 18, 20.)

Plaintiff makes various arguments related to this charge, including that the discovery of the video was not random, but rather based on a request by Mr. Lynch.   However, Plaintiff has offered no evidence to support that speculation.   There also appears to be no evidence to contradict the evidence showing that the video was sent by the Safety Department not to Mr. Lynch, but to Mr. Villegas, and that it was Mr. Villegas who then entered the charge or assessment against Plaintiff for the violations shown on that video.   To the extent that Plaintiff argues that Mr. Lynch was responsible for this charge being brought against him in the first

instance, that argument therefore fails.

However, that does not mean that there can be no reasonable inference of retaliatory intent attached to this charge.   Although there is no evidence to indicate that Mr. Lynch was involved in the initiation of the charge, he did act as the hearing officer related to the charge, and ultimately found the charge to have been proven.   Further, the decision to terminate Plaintiff's employment following this most-recent charge was undisputedly based not only on the charge itself, but also on the three preceding post-injury disciplinary actions, two of which, as discussed above, had been initiated and pursued by Mr. Lynch. (Dkt. No. 35, Attach. 11, at 20-21, 27 ["[I]t wasn't based on whether he was smoking or whether he was not having side shields, it was the number of incidents he had in a short period of time that he walked himself through the policy."].)

Also notable is the fact that, although there is various deposition testimony regarding the fact that employees could be and had been assessed with rule violations for smoking and/or failing to wear side shields (Dkt. No. 35, Attach. 52-54; Dkt. No. 35, Attach. 11, at 33; Dkt. No. 35, Attach. 29, at 18-20), Mr. Novicky in particular admitted that, other than one employee who had to be talked to multiple times about not smoking in the cab, "most of the time" he merely did informal coaching or counseling for such conduct.   (Dkt. No. 35, Attach. 29, at 19.)   Regarding the proffered comparator evidence, that list includes one employee who was assessed with smoking in the cab of a locomotive and failing to wear his safety glasses, charges almost identical to the ones that were assessed as a "Serious 3" offense for Plaintiff, yet that other employee received only counseling for such conduct.   (Dkt. No. 35, Attach. 33, at 85.)   There do not appear to be any other instances of a comparator even being counseled for smoking in a

locomotive, much less formally disciplined as a result of such violation.    Further the only other comparator who had any discipline, even an ICI, related to eye protection was an employee who was charged with a "Serious 1" offense for not only failing to wear safety glasses, but also sleeping while operating the train and using his cell phone in the locomotive during the same run.   (Dkt. No. 35, Attach. 33, at 33.)   This employee's conduct is clearly not comparable given the other egregious rule violations that were included within that charge.   Overall, the comparator evidence, considered together with the other context discussed above, could permit a reasonable factfinder to conclude that this disciplinary action was motivated at least in part on retaliatory intent.

###   v.     Analysis

Based on the above discussions, the Court finds that there is at least a genuine dispute of material fact regarding whether Plaintiff's ultimate termination, which is inherently intertwined with the other instances of discipline leading up to that termination due to the nature of the progressive discipline policy used by Defendants, was related to his injury report on August 2, 2019.   According to the current record, the only apparent rule violation assessed against Plaintiff before the date of his injury report since his employment with Defendant began in April 2015 was a single instance of a failure to wear side shields in July 2018, which was resolved informally with an ICI.   Yet, following Plaintiff's injury report, he was formally charged with multiple rule violations and disciplined not only for the circumstances surrounding his injury, but also for additional observed infractions occurring in December 2018 just days after he returned to work following recovery from his shoulder injury, a week later in January 2019, and in March 2019.   The fact that Plaintiff was seemingly never formally charged with any rule infractions

(and had only a single documented instance of informal counseling) in the approximately three years he had been employed by Defendant prior to his injury and then was subjected to four formal disciplinary charges over the course of approximately four months of working time[110] following his injury report can be interpreted by a reasonable factfinder as being indicative of retaliatory intent.   *Cf. Garza v. Wautoma Area School District*, 984 F. Supp. 2d 932, 947 (E.D. Wis. 2013) (noting, in a Title VII case, "[a]n employer's sudden criticism of an employee's performance may raise an inference of retaliation") (citing *Lang v. Illinois Dep't of Children & Family Servs.*, 361 F.3d 416, 419 [7th Cir. 2004]); *Smith v. Xerox Corp.*, 371 F. App'x 514, 520 (5th Cir. 2010) (finding, in a retaliation case under Title VII, that a reasonable person could conclude that there was a causal link between the protected activity and the adverse action where the plaintiff was a long-tenured employee with no prior disciplinary history who was subjected to "suspicious new charges of wrongdoing for arguably minor incidents" following the filing of an EEOC complaint and then was terminated shortly after filing that complaint); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (finding, in a Title VII case, that plaintiff had not shown a causal nexus where the adverse action was based in part on disciplinary events that occurred months before his protected activity).   This is bolstered by various facts related to the individual charges that were already discussed above.   Although disciplinary infractions can often be considered intervening events that might sever temporal connection between the protected activity and the ultimate adverse action, this inquiry is nonetheless a heavily fact-based one.   Although it is not the province of this Court to second-guess or relitigate a defendant's internal disciplinary decisions, whether those decisions can be reasonably construed as having been motivated by retaliatory animus as opposed to by a good-faith belief that Plaintiff was

---

[110]     The evidence indicates that Plaintiff was out of work related to the August 2, 2019, injury

guilty of such conduct, or whether they are consistent with the defendant's typical application of its rules and policies, are inherently part of the Court's consideration of whether retaliation was a contributory factor in Plaintiff's termination, especially given that the context of those disciplinary actions can serve as circumstantial evidence of intentional retaliation.

Further, the rule violations with which Plaintiff was charged for the two operational test failures observed by Mr. Lynch (i.e., lacking a defined boot heel and engaging in unrelated tasks during a shove maneuver) involve somewhat vague language that is open to interpretation; as discussed previously, because neither "defined heel" nor "unrelated tasks" are clearly defined in Defendant's rules, a manager would be required to exercise some level of discretion when determining whether such rules have been violated.  *See Boatright*, 2023 WL 4548280, at *11 (noting that charges for violation of "vague" rules require careful examination because such rules "could cover a vast range of situations and implicate at least some degree of supervisory enforcement discretion") (collecting cases).   Mr. Lynch, who Plaintiff specifically alleges was "birddogging" him, observed and reported the December and January charges, and acted as the hearing officer related to the March charge that ultimately led to Plaintiff's termination. Further, there is at least a genuine dispute of material fact as to whether Defendant initiated formal charges against Plaintiff for conduct that it would not otherwise generally charge employees (as opposed to counseling them), and such fact can show retaliatory intent even if Plaintiff did actually violate the rules in question.  *See Boatright*, 2023 WL 4548280, at *12 (noting that, although there was no dispute that plaintiff took a longer break than permitted, "if Defendant does not routinely punish employees for taking extended breaks, then Defendant's actions would still be retaliatory," especially in the context of allegations that the defendant

---

until late December 2018.   (Dkt. No. 37, Attach. 12.)

managers were watching him more carefully to find rule violations with which to charge him).

Given these circumstances, a reasonable factfinder could conclude that Plaintiff's termination was related to his injury report in that the various disciplinary charges that allowed for such termination under the IDPAP can themselves reasonably be construed as a pattern of retaliatory conduct.

**b.      Temporal Proximity**

As to the second factor, under a rigid interpretation, the temporal connection between Plaintiff's injury report and his ultimate termination is not strong.   Plaintiff reported the injury on August 2, 2018, the date the injury occurred, and his employment was terminated on April 26, 2019, approximately nine months later.   Further, there were multiple disciplinary charges that, again, under a strict interpretation, could constitute intervening incidents.   However, as was discussed in detail above, there is sufficient evidence from which a reasonable factfinder could conclude that those charges were brought and/or sustained at least in part based on a retaliatory motive, especially given that there is no evidence that Plaintiff had received any formal disciplinary charges before he reported his injury.   As a result, the consideration of temporal proximity differs somewhat in this case from others in that it cannot be a simple assessment of the length of time between Plaintiff's injury report and his termination; such an unnuanced application would ignore the practical realities and facts of this case.   The fact that Plaintiff was charged with three disciplinary charges in the span of the approximately four months after he returned to work (two of which occurred approximately a week apart not long after he had returned to work, and ultimately provided Defendant with grounds to terminate Plaintiff under its progressive discipline policy) suggests that there is at least some degree of practical temporal

proximity between Plaintiff's protected activity and his termination.

### c.     Fairness of Disciplinary Proceedings

As to the third factor, Plaintiff was afforded a hearing in accordance with the policies of

the Collective Bargaining Agreement and was represented at the relevant hearing by Steven

Ruffalo, Plaintiff's union's Local Chairman.   (Dkt. No. 35, Attach. 4.)   Both Plaintiff and

his representative affirmed on the record that they were allowed to present witnesses and evidence

on his behalf and to cross-examine all witnesses.   (Dkt. No. 35, Attach. 4, at 29-30.)   Plaintiff

does make various arguments that the hearings for all of his disciplinary charges were not fair or

impartial because they were merely a formality to nominally comply with the Collective

Bargaining Agreement before finding him guilty of the charged conduct.   However, those

arguments are not supported by the evidence upon which Plaintiff relies, for reasons that were

already discussed above regarding the Statement of Material Facts.

Plaintiff filed a claim with the Public Law Board, which reviewed Defendant's decision

and found that his dismissal was not arbitrary or excessive after considering both the hearing

record and the union's claim that Mr. Lynch had prior knowledge of the case and had

pre-prepared questions before the hearing.   (Dkt. No. 35, Attach. 30, at 2-3.   As a result, this

factor weighs in favor of Defendant, although, as will be discussed further below, that weight is

somewhat lessened by the fact that Mr. Lynch, the specific manager who Plaintiff asserts was

retaliating against him, acted as the hearing manager at the relevant hearing that led to his

termination.

### d.     Department of Labor Findings

As to the fourth factor, the record establishes that Plaintiff filed a complaint with OSHA.

(Dkt. No. 35, Attach. 10.)   In a letter dated May 14, 2020, on Department of Labor letterhead, OHSA concluded that Defendant had shown by clear and convincing evidence that Plaintiff's protected activities did not contribute to the adverse action and there was no reasonable cause to believe that Defendant violated FRSA.   (*Id.* at 2-3.)   This fact therefore also supports Defendant's motion.

> **e.      Participation of Allegedly Hostile Individuals in Discipline**

As to the fifth factor, Plaintiff has testified that Mr. Lynch in particular was hostile towards him and "birddogged" him in an effort to get his employment terminated following his injury report; and it is undisputed that Mr. Lynch was the hearing officer at the relevant hearing and participated in finding Plaintiff guilty of the charge that ultimately resulted in his termination.   There is also, as was discussed above, evidence from which a reasonable factfinder could conclude that Mr. Lynch was aware that Plaintiff had reported an injury before he charged Plaintiff with the December violation and well before he acted as the hearing officer on the relevant March charge.   Although there is no apparent evidence that Mr. Lynch was specifically involved in the decision to terminate Plaintiff's employment, this factor nonetheless weighs in favor of a finding that retaliation for protected activity was a contributing factor in Plaintiff's termination based on his intimate involvement in three of the instances that were used to justify Plaintiff's termination.

In sum, Plaintiff has adduced sufficient evidence to raise at least a genuine dispute of material fact regarding whether he can establish a prima facie case of retaliation as to his ultimate termination.   Summary judgment on this issue is therefore not appropriate.

> **3.      Whether Defendant Would Have Taken the Same Action in the Absence of Plaintiff's Injury Report**

77

After careful consideration, the Court finds that there exists a genuine dispute of material fact as to this issue, and therefore summary judgment is not appropriate on this issue either.

As was discussed above, if Plaintiff can show a prima facie case of retaliation, "the burden shifts to the employer to demonstrate by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity." *Lockhart v. MTA Long Island R.R.*, 949 F.3d 75, 79 (2d Cir. 2020).

Defendant's arguments related to why it has met this standard are problematic for many of the reasons already discussed above regarding the relatedness of Plaintiff's termination to his injury report, namely the inference of retaliatory intent in the facts related to the various disciplinary charges Plaintiff received in the months after his injury.   Further, also as discussed above, Defendant's attempt to show that similarly situated employees were similarly disciplined does not constitute clear and convincing evidence in this instance.   Defendant's argument that the individuals they have identified are clearly similarly situated merely on the basis that they were terminated after accruing three or four serious violations is unpersuasive given that the evidence they present shows that those individuals were disciplined for a wide range of conduct, most of which have no similarity to the conduct for which Plaintiff was disciplined, and their disciplinary violations did not occur in the same temporal contexts as did Plaintiff's (*i.e.*, multiple rule violations of a similar nature within a relatively short span of time).   Indeed, all that this evidence clearly establishes is that Defendant complied with the IDPAP by not terminating any of these employees before they had accrued three serious violations in a three-year period.   However, the question in this case is not whether Defendant complied with the IDPAP; it is undisputed that it did not terminate Plaintiff until after he had been found guilty

of four serious violations.   The question is whether those violations were charged and pursued out of an intent to retaliate against Plaintiff in order to bring about the grounds for the termination of his employment.

The evidence presented here is not similar to that which was found sufficient in *Kuduk v. BNSF Ry. Co.*, 980 F. Supp. 2d 1092 (D. Minn. 2013).   Although the various employees in the evidence presented by Defendant did commit various serious rule violations, the rules violated were by and large not the same rules that Plaintiff was charged with violating.   Nor were any of those employees dismissed for the same series of rule violations as was Plaintiff.   Further, as was discussed above, this is also not a case where "[t]here is no evidence that [Defendant] treated other similarly-situated employees less harshly"; the other employees for whom documentation has been provided that committed the same or somewhat similar rule violations as those Plaintiff committed were indeed generally treated less harshly.   *Kuduk*, 980 F. Supp. 2d at 1102.   Under the circumstances presented, Defendant has not shown sufficiently clear and convincing evidence that it would have terminated Plaintiff in the absence of his injury report to merit the entry of summary judgment.

Defendant's argument regarding Plaintiff's termination is based on the fact that it was justified in doing so under the IDPAP as a result of the various disciplinary violations, but, given the significant questions that exist relating to whether those disciplinary charges are themselves the products of a pattern of retaliatory practice as a pretext to justify Plaintiff's eventual termination, those charges cannot serve as clear and convincing evidence to support Defendant's defense here until those underlying factual questions are resolved.   Defendant argues that the Court should not second-guess the wisdom, fairness, or even correctness of Defendant's business

decisions related to the discipline imposed; but, as was already discussed, the fairness of the discipline that Defendant has imposed on Plaintiff since his injury report is a core material fact at the heart of Plaintiff's claim of retaliation.   The assessment of those disciplinary violations is an assessment of whether Defendant had a valid lawful reason for terminating Plaintiff under the terms of the IDPAP, and ultimately whether the termination of Plaintiff was retaliatory.

Lastly, to the extent that Defendant asserts that it had valid grounds to terminate Plaintiff's employment based on the fact that he had three assessed violations of the rule related to wearing side shields (even absent consideration of his other rule violations), the Court finds that argument insufficient to show that Defendant would have terminated Plaintiff even in absence of protected conduct.   Notably, Defendant's reliance on the statement in the IDPAP that it may treat repeated violations of the same rule under Part II of that policy (which applies to Major offenses) does not appear to clearly justify Defendant's decision to terminate Plaintiff. Although it is undisputed that Plaintiff had operational test failures related to failing to wear side shields in July 2018 and February 2019, it is also undisputed that both of those test failures were resolved with an ICI, which seemingly does not place those violations within the ambit of the IDPAP.   There is no evidence presented to establish that issues resolved with an ICI, as opposed to being classified as either a Non-Major or Major offense, count towards the "repeat offender" specification in the IDPAP.   Of note, the IDPAP itself states, in clarification of its more general indication that "employees violating the same rule with the three (3) year rolling period will be considered repeat offenders," that "[i]f the second *non-major* offense is the same as the first *non-major* offense, the individual will be handled in accordance with Part II of the policy." (Dkt. No. 35, Attach. 4, at 3 [emphasis added].)   Defendant has presented no evidence or even

argument that a violation resolved with an ICI is considered a non-major offense, and indeed Plaintiff's own disciplinary history seems to suggest they are not, given that his August 2018 rule violation was considered his first offense under the IDPAP, not the July 2018 side shields violation.   Nor is there any indication that the February 2019 side shields violation was part of his progressive disciplinary status, and, again, Defendant does not make any such argument. Because there is no evidence that Plaintiff's July 2018 and February 2019 operational test failures for failing to wear side shields were classified as "non-major" offenses under the IDPAP at the time Defendant disciplined Plaintiff for those infractions, Defendants have not shown that Plaintiff's March 2019 failure to wear side shields entitled them to consider him a "repeat offender" for the purposes of applying a higher level of discipline under the IDPAP regardless of any of the other disciplinary charges at issue here.

For all of the above reasons, the Court denies Defendant's motion for summary judgment.

**B.      Whether the Court Should Grant Defendant's Motion to Exclude the Testimony of Plaintiff's Expert Witness**

After careful consideration the Court finds that Defendant's motion to exclude the prospective testimony of George Gavalla is granted in part and denied in part.

Mr. Gavalla is not a stranger to providing expert testimony in federal actions.   As the parties note in their memoranda related to this motion, Mr. Gavalla has provided testimony on very similar issues in multiple other cases involving claims related to railroad safety and specifically retaliation for reporting an injury.   These courts have generally recognized that Mr. Gavalla's experience in railroad safety and credentials are sufficient to qualify him as an expert, and that "railroad administration and regulation are topics likely outside 'the understanding of

Case 5:20-cv-01467-GTS-ATB   Document 43   Filed 12/20/23   Page 82 of 84

the average juror'" such that at least some of his testimony would be helpful for allowing the jury to understand relevant issues.   *See, e.g., Frost v. BNSF Railway Co.,* 218 F. Supp. 3d 1122 (D. Montana 2016); *Wooten v. BNSF Railway Co.,* 2018 WL 2471275 (D. Montana June 1, 2018); *Whitt v. Union Pacific R.R. Co*., 2014 WL 3943135 (D. Nebraska Aug. 12, 2014); *Barati v. Metro-North R.R. Commuter R.R. Co*., 939 F. Supp. 2d 143 (D. Conn. 2013); *Ard v. Metro-North Railroad Co*., 492 F. Supp. 2d 95 (D. Conn. 2007).   The Court sees no reason to make a contrary finding in this case.

Although some courts that have been presented with pretrial motions related to the admissibility of Mr. Gavalla's testimony have found such determinations better suited to resolution during trial,[111]  the courts that have rendered concrete decisions on pretrial motions have rendered fairly consistent determinations regarding what portions of his testimony should be permitted and what others should not.   Topics routinely found to be permissible are the following: (1) testimony generally regarding railroad safety rules and regulations, (2) the purpose and requirements of the individual railroad's internal control plan, (3) the importance of accurate injury reporting by railroads and the FRA's need for such data, including the negative effects of underreporting, (4) categories of conduct that violate FRA regulations and/or the railroad's internal control plan, and (5) the standards of care in the industry related to reporting injuries and reasons why accurate injury data might not be reported.   *Wooten*, 2018 WL 2471275; *Frost*, 218 F. Supp. 3d 1122; *Whitt*, 2014 WL 3943135; *Barati*, 939 F. Supp. 2d 143.   The Court agrees that such testimony, to the extent it is disclosed and addressed in Mr. Gavalla's expert report in this case, is permissible and should not be excluded.

These same courts did, however, exclude other portions of Mr. Gavalla's opinions,

---

[111]    *See Jarka v. Holland*, 2018 WL 4144688 (D. N.J. Aug. 30, 2018); *Vanderburgh v.*

including the following: (1) any opinions regarding whether the defendant violated any law or standard of care or that the evidence otherwise satisfies any part of the relevant legal analysis; (2) any opinions about whether any action by the defendant was a pretext for retaliation; (3) any opinions regarding the meaning of a certain statute; (4) any opinion about whether the defendant complied with its own policies; (5) any credibility assessments of the plaintiff or others; and (6) any opinion that the defendant was motivated by the desire to achieve goals in the compensation plan that would increase manager bonuses.   *Wooten*, 2018 WL 2471275; *Frost*, 218 F. Supp. 3d 1122; *Whitt*, 2014 WL 3943135; *Barati*, 939 F. Supp. 2d 143.   It is not a controversial proposition that expert witnesses are not permitted to offer legal conclusions or otherwise provide testimony that will have the effect of usurping the factfinding function of the jury.   *See Choi v. Tower Research Capital LLC*, 2 F.4th 10, 20 (2d Cir. 2021) ("Expert testimony that usurps the role of the factfinder or that serves principally to advance legal arguments should be excluded."); *United States v. Duncan*, 42 F.3 97, 101 (2d Cir. 1994) ("The use of expert testimony is not permitted if it will usurp . . . the role of the jury in applying the law to the facts before it.   When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's."). To the extent Mr. Gavalla's report suggests conclusions that run afoul of this rule, or implicates any of the opinions identified above that other courts have found to be inadmissible, his testimony must be excluded.

Having carefully reviewed both Mr. Gavalla's expert report, the relevant law, and the rationale in the above cases, the Court finds that Mr. Gavalla's testimony should not be wholly excluded, and thus denies Defendant's motion in part; however, the Court finds that Mr.

---

*National R.R. Passenger Corp.*, 2007 WL 549740 (D. Conn. Feb. 16, 2007).

Gavalla's testimony should be limited in the respects outlined above.   To the extent that Defendant has objections regarding the admissibility of specific individual statements or opinions about which Mr. Gavalla is likely to testify beyond the categories outlined above, such individual objections would be better addressed at trial (or in a pre-trial motion).

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 35) is **DENIED**; and it is further

**ORDERED** that Defendant's motion to exclude the trial testimony of Plaintiff's expert witness (Dkt. No. 36) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that a pretrial conference shall be scheduled in this action, at which counsel shall appear with settlement authority.

Dated: December 20, 2023
        Syracuse, New York

Glenn T. Suddaby
U.S. District Judge